[PUBLISH]

In the

# United States Court of Appeals

### For the Eleventh Circuit

_____

No. 20-13139

_____

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

*versus*

IGNACIO JIMENEZ-SHILON,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Middle District of Florida
D.C. Docket No. 8:19-cr-00393-WFJ-SPF-1

_____

Before NEWSOM, BRANCH, and BRASHER, Circuit Judges.

NEWSOM, Circuit Judge, delivered the opinion of the Court.

NEWSOM, Circuit Judge, filed a concurring opinion.

NEWSOM, Circuit Judge:

This case requires us to decide whether a federal law that prohibits illegal aliens from possessing firearms violates the Second Amendment to the United States Constitution, which guarantees "the right of the people to keep and bear Arms." U.S. Const. amend. II. We hold that it does not.

I

Ignacio Jimenez-Shilon, an illegal alien from Mexico, lived in the United States for more than 20 years before his recent deportation. One afternoon in 2019, he drunkenly brandished a gun outside a taco stand in Tampa, Florida. He was arrested, and a grand jury charged him with one count of possession of a firearm by an illegal alien, in violation of 18 U.S.C. § 922(g)(5)(A).

Although Jimenez never disputed his guilt, he moved to dismiss the indictment on the ground that a conviction would impermissibly punish him for engaging in conduct protected by the Second Amendment. Jimenez also sought an evidentiary hearing to establish his connections with the United States. The district court denied Jimenez's motion to dismiss and later denied his motion for reconsideration.

The case proceeded to a stipulated bench trial, where the district court found Jimenez guilty based on the undisputed facts. Acknowledging that Jimenez had served more than a year in prison on pretrial detention, the court imposed a sentence of a year and a day, followed by three years of supervised release. Jimenez appealed. Our review of his constitutional claim—that § 922(g)(5)(A) violates the Second Amendment—is de novo. *United States v. Bolatete*, 977 F.3d 1022, 1032 (11th Cir. 2020).

## II

The Second Amendment provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. In *District of Columbia v. Heller*, the Supreme Court held "that the Second Amendment confer[s] an individual"—as opposed to a collective—"right to keep and bear arms." 554 U.S. 570, 595 (2008); *see also McDonald v. City of Chicago*, 561 U.S. 742, 767–68 (2010). Jimenez's argument to us is straightforward: (1) Even as an illegal alien, he lived in the United States for decades and was thus among "the people" whom the Second Amendment protects; and (2) as a consequence, he couldn't be punished for exercising his individual right to possess a firearm.

But the inquiry isn't as mechanical as Jimenez suggests. As we will explain, being a member of "the people" to whom the Second Amendment applies as a general matter is a *necessary* condition to enjoyment of the right to keep and bear arms, but it is not alone *sufficient*. The reason is that the Second Amendment's text

shows that it codified what the *Heller* Court called a "pre-existing right," 554 U.S. at 592, 603—the right "to keep and bear Arms"—and that right's particular history demonstrates that it extended (and thus extends) to some categories of individuals, but not others. Accordingly, as the Supreme Court put it in *Heller*, certain groups of people—even those who might be among "the people"—may be "disqualified from" possessing arms without violating the Second Amendment. *Id.* at 635; *accord United States v. Rozier*, 598 F.3d 768, 770–71 (11th Cir. 2010) (per curiam). Based on our "examination of a variety of legal and other sources" from the Founding era, *Heller*, 554 U.S. at 605, we hold that illegal aliens are one such group.

## A

We begin with the threshold question presented by Jimenez's appeal: Who are "the people" mentioned in the Second Amendment? In *Heller*, the Supreme Court explained that phrase by reference to its earlier decision in *United States v. Verdugo-Urquidez*, 494 U.S. 259 (1990), which had considered the meaning of the Fourth Amendment's protection of "the people" against unreasonable searches and seizures. In that case, Verdugo, a Mexican citizen, was apprehended by Mexican officials and taken to a California prison. *Id.* at 262. While he was there, federal DEA agents conducted a warrantless search of his home in Mexico. *Id.* at 262–63. Verdugo sought to exclude the fruits of that search on the ground that he was among "the people" protected by the Fourth Amendment. The Supreme Court rejected Verdugo's argument

because, "[a]t the time of the search, he was a citizen and resident of Mexico with no voluntary attachment to the United States." *Id.* at 274–75.

In the course of its decision, the Court explained that "'the people' seems to have been a term of art employed in select parts of the Constitution." *Id.* at 265. Then, after canvassing several constitutional provisions, the Court interpreted the phrase as encompassing two groups:

> "[T]he people" protected by the Fourth Amendment, and by the First and Second Amendments, and to whom rights and powers are reserved in the Ninth and Tenth Amendments, refers to a class of persons [1] who are part of a national community or [2] who have otherwise developed sufficient connection with this country to be considered part of that community.

*Id.*; *see also Heller*, 554 U.S. at 580 (quoting this passage).

That "national community"-focused definition of "the people" finds support in Founding-era dictionaries. *See* Noah Webster, *American Dictionary of the English Language* 600 (1st ed. 1828) ("The body of persons who compose a community, town, city, or nation."); 2 Samuel Johnson, *A Dictionary of the English Language* 305 (6th ed. 1785) ("A nation; those who compose a community."). And we don't see any textual, contextual, or historical reason to think that the Framers understood the meaning of the phrase to vary from one provision of the Bill of Rights to another. *See United States v. Emerson*, 270 F.3d 203, 227–28 (5th Cir. 2001);

cf. IBP, Inc. v. Alvarez, 546 U.S. 21, 34 (2005) (explaining the cardinal rule of interpretation "that identical words used in different parts of the same statute are generally presumed to have the same meaning"). The Constitution's text shows that when the Framers meant to limit a provision's application to "Citizen[s]" per se, they did so expressly. See U.S. Const. art. I, § 2, cl. 2 (right to hold office in the House of Representatives); id. art. I, § 3, cl. 3 (same in Senate); id. art. II, § 1, cl. 5 (same for Presidency); id. art. IV, § 2, cl. 1 (Privileges and Immunities Clause). Likewise, when they meant to extend a provision's reach more broadly to encompass all "person[s]" in the United States, they did so expressly. See U.S. Const. amend. V; Plyler v. Doe, 457 U.S. 202, 210 (1982). It appears, then, at least as a general matter, that the phrase "the people" sits somewhere in between—it has "broader content than 'citizens,' and . . . narrower content than 'persons.'" United States v. Huitron-Guizar, 678 F.3d 1164, 1168 (10th Cir. 2012); see also 1 William Blackstone, Commentaries on the Laws of England *366 (1765) (considering "such persons as fall under the denomination of the people" to include "aliens and natural-born subjects," but observing, importantly, that the two groups held different sets of rights); 4 Jonathan Elliot, The Debates in the Several State Conventions on the Adoption of the Federal Constitution 556 (2d ed. 1836) (statement of James Madison suggesting that at least some "aliens" are entitled to the "protection and advantage" of the Constitution).

But that doesn't settle the matter. It's not self-evident where illegal aliens fit within Verdugo-Urquidez's two-part construct. On

the one hand, it seems clear enough that they are not inherently "part of [the] national community" within the meaning of the first half of that decision's disjunctive test. 494 U.S. at 265. But on the other hand, we can't rule out the possibility that at least *some* illegal aliens might, during their stays here, "have otherwise developed sufficient connection with this country to be considered part of that community," within the meaning of the second half. *Id.*; *see also, e.g.*, *United States v. Meza-Rodriguez*, 798 F.3d 664, 672 (7th Cir. 2015) (concluding that illegal aliens can be among "the people" for Second Amendment purposes); *Martinez-Aguero v. Gonzalez*, 459 F.3d 618, 625 (5th Cir. 2006) (same, for Fourth Amendment purposes). So, what about Jimenez? Are his two decades of residence in Florida enough? What about the fact that he has consistently paid his taxes? Or that his employment has contributed to our economy? Or that he has a U.S.-born child? Does it matter that he isn't living with that child? Or that he hasn't filed a formal tax return?

Happily, we needn't definitively decide whether Jimenez is among "the people" as a general matter. We can assume for the sake of our decision that he is and resolve this case more narrowly. The reason: We are concerned here specifically with the scope and application of the Second Amendment, which, as already explained, codified a "pre-existing right." *Heller*, 554 U.S. at 592, 603. And as both the Supreme Court and this Court have observed, even individuals who are indisputably part of "the people," such as dangerous felons and those suffering from mental illness, might not

partake of that pre-existing right and, therefore, may be prohibited from possessing firearms without offending the Second Amendment. *See Heller*, 554 U.S. at 626, 635; *Rozier*, 598 F.3d at 770–71. Just so here. Even if Jimenez can lay a legitimate claim to being among "the people" as a general matter, he—as an illegal alien—may be forbidden from bearing arms while living within our borders. Let us explain.

## B

Following *Heller*'s lead, we focus on the Second Amendment's text and history. "Like most rights, the right secured by the Second Amendment is not unlimited." *Heller*, 554 U.S. at 626. Instead, it was "widely understood that the Second Amendment, like the First and Fourth Amendments, codified a *pre-existing* right" held by the colonists—one that would not be "infringed" by the newly formed government. *Id.* at 592; *see* Webster, *American Dictionary of the English Language* 451 (defining "infringe" as "[t]o break . . . ; to violate; to transgress; to neglect to fulfill or obey"); 1 Samuel Johnson, *A Dictionary of the English Language* 1041 (6th ed. 1785) ("To violate; . . . To destroy; to hinder."). Accordingly, and importantly here, the right to keep and bear arms was "enshrined with the scope" that it was "understood to have when the people adopted" the Bill of Rights. *Heller*, 554 U.S. at 634–35. It was "not intended to lay down any novel principle[]," but rather, to "embody [a] guarant[ee] . . . which we had inherited from our English ancestors, and which had from time immemorial been sub-

ject to certain well-recognized exceptions arising from the necessities of the case." *Robertson v. Baldwin*, 165 U.S. 275, 281 (1897); *see Heller*, 554 U.S. at 592, 599. The disarmament of illegal aliens is one such exception.

Consider, first, the laws of England predating the Founding. The individual right to bear arms enshrined in the English Declaration of Rights—which "has long been understood to be the predecessor to our Second Amendment"—was not made "available to the whole population." *Heller*, 554 U.S. at 593. Instead, it was limited to the "Subjects which are Protestants, . . . suitable to their Conditions, and as allowed by Law." 1 W. & M., ch. 2, § 7, *in 3* Eng. Stat. at Large 441 (1689). We have found no historical evidence indicating that aliens shared this fundamental right with either natural-born Brits or denizens (who might be thought of as naturalized British subjects), both of whose relationships to the sovereign mirrored that of American "citizens."[1] Indeed, the right to own guns in eighteenth-century England was statutorily restricted to the landed gentry. *See, e.g.*, Patrick J. Charles, *Armed in America* 51, 58 (2018); Giles Jacob, *A New Law-Dictionary* (1750) (unpaginated), *reprinted in The Complete Bill of Rights: The Drafts, Debates, Sources, and Origins* 300 (Neil H. Cogan ed., 2d

---

[1] To the Framers, the term "citizen" was "considered better suited" than "subject" to "the description of one living under a republican government"—as opposed to a monarchy—and "it was adopted by nearly all of the States upon their separation from Great Britain." *Minor v. Happersett*, 88 U.S. (21 Wall.) 162, 166 (1874).

ed. 2015).  And the English common law simultaneously made it such that "aliens [were] incapacitated to hold lands."  *Bayard v. Singleton*, 1 N.C. 5, 9 (1787) (emphasis omitted); *see Dawson's Lessee v. Godfrey*, 8 U.S. (4 Cranch) 321, 323–24 (1808); Blackstone, *supra*, at *372.

The British conception of international law is of a piece.  As was common throughout eighteenth-century Europe, our English ancestors drew a sharp distinction between the privileges and immunities of natural-born or naturalized subjects, on the one hand, and aliens, on the other.  The former "ha[d] a great variety of rights," including "that of having arms for their defence, suitable to their condition and degree."  Blackstone, *supra*, at *143, *371; *see Heller*, 554 U.S. at 593–94.  By contrast, the rights of aliens were "much more circumscribed," and it was "left in the power of all states to take such measures about the admission of strangers as they [thought] convenient."  Blackstone, *supra*, at *259, *371.  Given this broad sovereign authority, it was well understood that aliens "d[id] not participate in all the rights of citizens"; they instead "enjoy[ed] only the advantages which the law or custom [gave] them."  1 Emer de Vattel, *The Law of Nations* § 213, at 101 (Joseph Chitty ed., 1883).[2]

---

[2] "Vattel's influence on the Founders in framing the Constitution is immeasurable.  His influence would have included the Founders' understanding of the rules of naturalization (such as who may obtain a country's rights, privileges, and immunities), the laws of war, foreign affairs, and immigration."  Patrick J. Charles, *Representation Without Documentation?: Unlawfully Present*

20-13139                Opinion of the Court                11

All of this suggests that aliens didn't share in the right to bear arms that Englishmen enjoyed. As a general matter, they "could not claim the rights and liberties of the English subject." Patrick J. Charles, *The Plenary Power Doctrine and the Constitutionality of Ideological Exclusions: An Historical Perspective*, 15 Tex. Rev. L. & Pol. 61, 72 (2010). And with respect to firearms, in particular, "the government was free to treat them as it pleased." *See id*.

The English view carried across the Atlantic, where it was well understood that the right to bear arms "did not extend to all New World residents." Joyce Lee Malcolm, *To Keep and Bear Arms: The Origins of an Anglo-American Right* 140 (1994). For example, several colonies enacted "complete bans on gun ownership" by slaves and Native Americans. Adam Winkler, *Heller's Catch-22*, 56 UCLA L. Rev. 1551, 1562 (2009). "Neither the Indian nor the slave was a citizen" of the British colonies and, accordingly, "neither was entitled to the rights of English subjects." Malcolm, *supra*, at 141. Just as in England, they could be prevented from keeping and bearing arms "on the ground of alienage" or lack of

---

*Aliens, Apportionment, the Doctrine of Allegiance, and the Law*, 25 BYU J. Pub. L. 35, 77 (2011) (footnote omitted); *see also, e.g.*, *Franchise Tax Bd. v. Hyatt*, 139 S. Ct. 1485, 1493 (2019) (referring to Vattel as the "founding era's foremost expert on the law of nations"); *Miller v. The Ship Resolution*, 2 U.S. (2 Dall.) 1, 15 (1781) (calling Vattel "a celebrated writer on the laws of nations").

allegiance to the sovereign.  Don B. Kates, Jr., *Handgun Prohibition and the Original Meaning of the Second Amendment*, 82 Mich. L. Rev. 204, 217 n.54 (1983).

So too, some of the colonies disarmed white aliens, who weren't members of the polity.  *See* Akhil Reed Amar, *The Bill of Rights: Creation and Reconstruction* 48 (1998) (explaining that, while aliens in the colonies held "sundry" civil rights, they "typically could not vote, hold public office, or serve on juries" and didn't have "the right to bear arms," because these "were rights of members of the polity").  At first, "colonial governments prohibited any white person unwilling to affirm his allegiance to the British Crown from collecting firearms."  Adam Winkler, *Gun Fight: The Battle Over the Right to Bear Arms in America* 116 (2011). "Then, when the political winds shifted, people who didn't support the Revolution were ordered to turn over their guns." *Id.*; *see* Robert H. Churchill, *Gun Regulation, the Police Power, and the Right to Keep Arms in Early America: The Legal Context of the Second Amendment*, 25 L. & Hist. Rev. 139, 157–60 (2007) (compiling statutes).  In both cases, an individual's "'undivided allegiance to the sovereign'"—his "membership in the political community"—was regarded as "a precondition to the right to keep and bear arms." *United States v. Perez*, 6 F.4th 448, 462 (2d Cir. 2021) (Menashi, J., concurring) (quoting Churchill, *supra*, at 157).

These laws reveal "an early feature of the emerging republic"—the selective "disarmament of groups associated with foreign elements."  Pratheepan Gulasekaram, *"The People" of the Second*

*Amendment: Citizenship and the Right to Bear Arms*, 85 N.Y.U. L. Rev. 1521, 1548–49 (2010).  By refusing to take an oath of allegiance to the state, those associated with foreign governments renounced their membership in the American political community and, in doing so, forfeited the state's protection of their right to arms—even if they continued to live on American soil.  *See Perez*, 6 F.4th at 462 (Menashi, J., concurring).

Consistent with the English and colonial accounts, various Framing-era sources "refer to arms-bearing as a *citizen's* right" that was closely associated with national fealty and membership in the body politic.  Note, *The Meaning(s) of "The People" in the Constitution*, 126 Harv. L. Rev. 1078, 1093 (2013) (emphasis added).  To take one example, the Federalist Papers explained that one of the bulwarks of personal liberty was the prospect of "citizens with arms in their hands."  The Federalist No. 46, at 296 (James Madison) (Clinton Rossiter ed., 1961).  "If the representatives of the people" were to "betray their constituents," Hamilton proclaimed, then it would be the natural right of the "citizens" to "rush tumultuously to arms."  The Federalist No. 28, at 176 (Alexander Hamilton); *see also, e.g.*, 3 Joseph Story, *Commentaries on the Constitution of the United States* § 1890, at 746 (1833) ("The right of the citizens to keep and bear arms has justly been considered, as the palladium of the liberties of a republic; since it offers a strong moral check against the usurpation and arbitrary power of rulers" and "enable[s] the people to resist and triumph over them.").  Yet when the Constitution was submitted for ratification, many feared that

the lack of an express guarantee of the right to bear arms would lead to an erosion of liberty—particularly because the new charter empowered Congress to call forth the militia and raise an army and navy. *See Heller*, 554 U.S. at 598. Thus, several proposals quickly emerged in the States urging the adoption of an amendment explicitly prohibiting Congress from disarming "citizens." *See* Charles, *Armed in America, supra*, at 94; *The Complete Bill of Rights, supra*, at 275 (documenting the Massachusetts proposal that Congress be barred from "prevent[ing] the people of the United States, who are peaceable citizens, from keeping their own arms," as well as the New Hampshire proposal that "Congress shall never disarm any Citizen unless such as are or have been in Actual Rebellion").

The Second Amendment seems to have codified this principle. *See Heller*, 554 U.S. at 592–93, 599. "It was understood across the political spectrum that the right" to keep and bear arms "helped to secure the ideal of a citizen militia, which might be necessary to oppose an oppressive military force if the constitutional order broke down." *Id.* at 599. At the same time, it helped to secure the citizen's right to self-defense when his government was unable (or unwilling) to protect him from private lawlessness. *See id.* at 594–95; Blackstone, *supra*, at *144. But just as it was in both England and colonial America, this right did not extend in the same fashion to persons outside the national polity. For them, the ability to keep and bear arms remained subject to governmental regulation. That is, Congress could lawfully restrict the privilege for those who—

like illegal aliens today—did not owe or swear allegiance to the United States. *See* Churchill, *supra*, at 159.

This understanding of the Second Amendment is buttressed by additional bits of historical evidence. First, it is buoyed by the phrasing of many early state constitutions, which—in northern and southern states alike—expressly limited the right to keep and bear arms to "citizens." *See* Pa. Const. of 1790, art. IX, § 21; Ky. Const. of 1792, art. XII, § 23; Miss. Const. of 1817, art. I, § 23; Conn. Const. of 1818, art. I, § 17; Ala. Const. of 1819, art. I, § 23; Me. Const. of 1819, art. I, § 16; *cf. Heller*, 554 U.S. at 603 (treating state constitutions that "protected an individual citizen's right to self-defense" as "strong evidence that that is how the founding generation conceived of the right").

Second, it is confirmed by a fundamental tenet of eighteenth-century international law. As Vattel explained, an alien could not "settle by a full right, and as he pleases, in the place he has chosen, but must ask permission of the chief of the place." Vattel, *supra*, § 230, at 107. Or, in the words of Blackstone: "[B]y the law of nations, no member of one society has a right to intrude into another." Blackstone, *supra*, at *259. To be sure, aliens who were "*permitted* to settle and stay in the country" often shared many privileges afforded to citizens. *See* Vattel, *supra*, § 213, at 101 (emphasis added); Blackstone, *supra*, at *370. But their attainment of these rights "came under a condition—this being that aliens owe[d] temporary obedience to the United States and its laws." Charles, *Representation Without Documentation*, *supra*, at 75–76; *see*

Blackstone, *supra*, at *370; Elliot Debates, *supra*, at 556 (statement of James Madison).  Moreover, such temporary allegiance—and the reciprocal right to protection—were not automatically forged by dint of an alien's mere physical presence in the country.  "In England, [that reciprocal arrangement] often required the announcing of one's presence and taking an oath.  The same held true in the United States."  Patrick J. Charles, *Decoding the Fourteenth Amendment's Citizenship Clause: Unlawful Immigrants, Allegiance, Personal Subjection, and the Law*, 51 Washburn L.J. 211, 219 (2012) (footnote omitted).  As a result, aliens could not surreptitiously enter a foreign nation in violation of the immigration prerogatives of the sovereign and expect to receive all the rights and protections of the citizenry.  Nor can they do so today.  *See, e.g.*, *Demore v. Hyung Joon Kim*, 538 U.S. 510, 522 (2003); *Mathews v. Diaz*, 426 U.S. 67, 78–80 (1976).[3]

⋆   ⋆   ⋆

None of this, of course, is to suggest that illegal aliens in the United States have no constitutional rights whatsoever.  *See Verdugo-Urquidez*, 494 U.S. at 270–71.  But consistent with the Second Amendment's text and history, they do not enjoy the right to keep and bear arms.  Accordingly, we hold that 18 U.S.C. § 922(g)(5)(A)

---

[3] For all of these reasons, we needn't—and don't—decide whether a similar prohibition restricting arms possession for *lawfully* admitted aliens would violate the Second Amendment.

passes constitutional muster.[4]  The law's ban on firearm possession by illegal aliens does not "infringe[]" the right that the Second Amendment embodies.  *See Heller*, 554 U.S. at 592.[5]

       We **AFFIRM** Jimenez's conviction.

---

[4] In so holding, we join the seven circuits that have confronted the issue before us, all of which have concluded—albeit for a variety of reasons—that § 922(g)(5)(A) does not violate the Second Amendment.  *See Perez*, 6 F.4th at 456 (majority op.); *id.* at 463 (Menashi, J., concurring); *United States v. Torres*, 911 F.3d 1253, 1264 (9th Cir. 2019); *Meza-Rodriguez*, 798 F.3d at 673; *United States v. Carpio-Leon*, 701 F.3d 974, 982 (4th Cir. 2012); *Huitron-Guizar*, 678 F.3d at 1168–70; *United States v. Flores*, 663 F.3d 1022, 1023 (8th Cir. 2011) (per curiam); *United States v. Portillo-Munoz*, 643 F.3d 437, 442 (5th Cir. 2011).

[5] One last point.  Jimenez separately contends that the district court erred in refusing to grant him an evidentiary hearing to establish his connections with this country.  He admits, however, that he is an illegal alien.  And for reasons already explained, that dooms his Second Amendment defense.  Therefore, even if Jimenez could have made good on his allegations, that wouldn't have salvaged his motion to dismiss.  The district court didn't abuse its discretion.  *See United States v. Rothstein*, 939 F.3d 1286, 1292 (11th Cir. 2019) ("An evidentiary hearing is not required where none of the critical facts are in dispute and the facts as alleged by the defendant if true would not justify the relief requested." (quotation omitted)).

NEWSOM, Circuit Judge, concurring:

Needless to say, I concur in the majority opinion. I write separately to comment briefly on (1) what I take to be the appropriate Second Amendment framework, (2) this Court's precedent (or, as I think, lack thereof) regarding that framework, and (3) what we might learn from that framework in thinking about how we operationalize and protect other constitutional rights.

I

In the wake of *District of Columbia v. Heller*, 554 U.S. 570 (2008), and *McDonald v. City of Chicago*, 561 U.S. 742 (2010), the Supreme Court "has not definitively resolved the standard for evaluating Second Amendment claims." *Silvester v. Becerra*, 138 S. Ct. 945, 947 (2018) (Thomas, J., dissenting from the denial of certiorari). Left with that analytical vacuum, many of our sister circuits have adopted the following two-step test: A reviewing court initially "ask[s] if the restricted activity is protected by the Second Amendment in the first place" and, then, if it is, proceeds to apply an "appropriate level of scrutiny." *GeorgiaCarry.Org, Inc v. Georgia*, 687 F.3d 1244, 1260 n.34 (11th Cir. 2012) (collecting cases).

I'm on board with step one, which calls for an originalist inquiry of the sort that (I hope) characterizes the majority opinion in this case. *See id.* at 1261 (analyzing the "text of the Second Amendment" as well as "the historical background" against which that text was adopted). But I view step two as problematic—not only because it elevates the normative views of "we the judges" over

2                    Newsom, J., concurring                    20-13139

"We the People" through an ill-defined balancing test, but also because it stands in significant tension with Supreme Court precedent. *See Rogers v. Grewal*, 140 S. Ct. 1865, 1866–67 (2020) (Thomas, J., joined by Kavanaugh, J., dissenting from the denial of certiorari) (concluding that *Heller* and *McDonald* foreclose use of the tiers of scrutiny and criticizing lower courts for adopting an "entirely made up" test). As then-Judge Kavanaugh summarized, "*Heller* and *McDonald* leave little doubt that courts are to assess gun bans and regulations based on text, history, and tradition, not by a balancing test such as strict or intermediate scrutiny." *Heller v. District of Columbia* (*Heller II*), 670 F.3d 1244, 1271 (D.C. Cir. 2011) (Kavanaugh, J., dissenting).[1] The first step, in other words, is the only step.

---

[1] Many other jurists and commentators have taken the same view. *See, e.g.*, *Duncan v. Bonta*, 19 F.4th 1087, 1143–44 (9th Cir. 2021) (en banc) (Bumatay, J., joined by Ikuta and Nelson, JJ., dissenting); *Mance v. Sessions*, 896 F.3d 390, 395 (5th Cir. 2018) (Elrod, J., joined by Jones, Smith, Willett, Ho, Duncan, and Engelhardt, JJ., dissenting from the denial of reh'g en banc); *Tyler v. Hillsdale Cnty. Sheriff's Dep't*, 837 F.3d 678, 702 (6th Cir. 2016) (en banc) (Batchelder, J., concurring in most of the judgment); *Binderup v. Att'y Gen. of U.S.*, 836 F.3d 336, 364 (3d Cir. 2016) (en banc) (Hardiman, J., joined by Fisher, Chagares, Jordan, and Nygaard, JJ., concurring in part and concurring in the judgments); Eugene Volokh, *Implementing the Right to Keep and Bear Arms for Self-Defense: An Analytical Framework and a Research Agenda*, 56 UCLA L. Rev. 1443, 1463 (2009).

20-1313                Newsom, J., concurring                3

I largely agree with that assessment.[2]  After thoroughly analyzing the text and history of the Second Amendment, the *Heller* majority expressly eschewed any type of "judge-empowering 'interest-balancing inquiry.'"  554 U.S. at 634; *see McDonald*, 561 U.S. at 790–91.  It instead emphasized that the Second Amendment, as adopted and ratified, represents "the very *product* of an interest balancing by the people"—one that modern judges cannot "conduct for them anew."  *Heller*, 554 U.S. at 635.  It's also worth noting that *Heller* was perhaps "the most explicitly and self-consciously originalist opinion in the history of the Supreme Court."  *United States v. Skoien*, 614 F.3d 638, 647 (7th Cir. 2010) (en banc) (Sykes, J., dissenting) (quoting Cass R. Sunstein, *Second Amendment Minimalism: Heller as Griswold*, 122 Harv. L. Rev. 246, 246 (2008)).  So, even if it "left many issues open" to further exploration, "that is not an invitation to marginalize the Court's holdings or disregard its decision method."  *Id.*  Adopting a sliding-scale form of means-ends scrutiny, I fear, does just that.  *Compare* Philip Hamburger, *The Inversion of Rights and Power*, 63 Buff. L. Rev. 731, 753 (2015)

---

[2] I say "largely" because it has never been clear to me what work "tradition" is supposed to be doing in the tripartite "text, history, and tradition" formulation.  The duly adopted and ratified text of the Second Amendment, as originally (and thus historically) understood, governs the interpretive inquiry.  To the extent that "tradition" is meant to stand in for the original (*i.e.*, historical) public meaning of the words on the page, it is duplicative.  And to the extent that it is meant to expand the inquiry beyond the original public meaning—say, to encompass latter-day-but-still-kind-of-old-ish understandings—it misdirects the inquiry.

("[W]hen a judge evaluates a government interest, he is deciding whether the interest of the government in its power trumps the interest of individuals in their rights."), *with Heller*, 554 U.S. at 634 ("The very enumeration of the right takes out of the hands of government—even the Third Branch of Government—the power to decide on a case-by-case basis whether the right is *really worth* insisting upon.").

Accordingly, we shouldn't ask whether a gun-control measure is, say, "substantially related" (how substantially?) to the achievement of an "important governmental interest" (how important?). *Contra, e.g.*, *United States v. Perez*, 6 F.4th 448, 455 (2d Cir. 2021) (quotation omitted). Such an amorphous inquiry risks unelected and unaccountable judges upholding or invalidating gun-control laws at will—without respect to the original public meaning of the Second Amendment. *Cf. Crawford v. Washington*, 541 U.S. 36, 67–68 (2004) ("By replacing categorical constitutional guarantees with open-ended balancing tests, we do violence to their design."). We should instead "conclude[] that text, history, and tradition"—or, as I would say, "text and history," *see supra* note 2—"are dispositive in determining whether a challenged law violates the right to keep and bear arms." *Rogers*, 140 S. Ct. at 1866 (Thomas, J., joined by Kavanaugh, J., dissenting from the denial of certiorari). Such an approach is more principled, more faithful to

20-1313                    Newsom, J., concurring                    5

*Heller*, and more consistent with the Second Amendment's text and original understanding.[3]

## II

My vote against means-ends interest balancing in Second Amendment cases leads me to make two additional observations—one procedural and the other substantive.

As for procedure:  The parties have assumed that we're bound by existing circuit precedent to means-ends scrutinize gun-control measures challenged under the Second Amendment.  I think they're mistaken.

For purposes of this case, the question is moot.  Today's opinion resolves Jimenez's claim at "step one."  As a textual and historical matter, the right to keep and bear arms did not—and thus does not—extend to illegal aliens.  Having so concluded, we had no reason to turn to means-ends scrutiny on the back end.  But what if the historical record had cut the other way?  Would we have

---

[3] After all, the Constitution guarantees that the right to keep and bear arms "shall not be infringed," not that it "shall not be infringed unless by restrictions that are substantially related to an important government interest."  To be sure, the Framers understood that there were a number of limitations baked into the scope of this fundamental right. *See Heller*, 554 U.S. at 626–27; *Heller II*, 670 F.3d at 1274–75 (Kavanaugh, J., dissenting).  But the two-part test that has emerged in the lower courts essentially accepts that we can *add* new ones should we see fit.  That can't be.  The Second Amendment was "enshrined with the scope [it was] understood to have when the people adopted [it], whether or not future legislatures or (yes) even future judges think that scope too broad." *Heller*, 554 U.S. at 634–35.

been bound by our opinion in *GeorgiaCarry.Org* to then apply an "appropriate level" of means-ends scrutiny? 687 F.3d at 1260 n.34.

I don't think so. "We are not required to follow dicta in our own prior decisions." *Pretka v. Kolter City Plaza II, Inc.*, 608 F.3d 744, 762 (11th Cir. 2010). And it seems to me that our suggestion in *GeorgiaCarry.Org* that "a two-step inquiry is appropriate" for resolving Second Amendment claims was exactly that. 687 F.3d at 1260 n.34. Because we "only reach[ed] the first step" in that case, *id.*, our footnoted suggestion that we "would apply" a second, means-ends-scrutiny step wasn't "necessary to the decision of [the] case," *Schwab v. Crosby*, 451 F.3d 1308, 1327 (11th Cir. 2006); *see also United States v. Caraballo-Martinez*, 866 F.3d 1233, 1244 (11th Cir. 2017) ("[T]he 'holding' of a prior decision can reach only as far as the facts and circumstances presented to the Court in the case which produced that decision.").

Notably, even after *GeorgiaCarry.Org*, we have never applied means-ends scrutiny in a published decision analyzing a Second Amendment challenge. Rather, we have always—and only—assumed that we would do so if we determined, in some unidentified future case, that a law "restricted activity" that is "protected by the Second Amendment in the first place." *GeorgiaCarry.Org*, 687 F.3d at 1260 n.34; *see United States v. Bolatete*, 977 F.3d 1022, 1036 (11th Cir. 2020); *United States v. Focia*, 869 F.3d 1269, 1285–87 (11th Cir. 2017); *GeorgiaCarry.Org, Inc. v. U.S. Army Corps of Eng'rs*, 788 F.3d 1318, 1324 (11th Cir. 2015); *see also United States*

20-1313                    Newsom, J., concurring                    7

*v. Rozier*, 598 F.3d 768, 771 (11th Cir. 2010) (per curiam); *United States v. White*, 593 F.3d 1199, 1206 (11th Cir. 2010).

To reiterate, I don't see how that method of analyzing gun-control measures can be squared with the Second Amendment's text. Just read back once more what we said in *GeorgiaCarry.Org.*: Our hypothesized approach acknowledged that a law may constitutionally "restrict[]" conduct that is "protected" by an enumerated right. 687 F.3d at 1260 n.34. Sounds a whole lot like an "infringe[ment]" to me. U.S. Const. amend. II.

In any event, the important point for present purposes is that we've never applied the second step—only imagined it. And because we've never applied it in the past, I don't think we'd be obliged to do so in the future, should the issue squarely present itself.

### III

On, then, to the final point—which, I'll confess, is more a bookmark for future reflection and inquiry than anything else. It's relatively easy for me (and others) to criticize the use of slippery means-ends tests in the Second Amendment context, because Second Amendment "law" is—relatively speaking—virgin territory. As courts think about how best to implement the right to keep and bear arms, we should do so the "right" way—which, I contend, is by reference to the provision's text and history. Full stop.

What, though, are we to do with the fact that the very sort of interest balancing that I (and others) decry in the Second Amendment is *de rigueur* in cases arising under, to cite just one prominent example, the First Amendment?  Free-speech cases, for instance, are so choked with different variations of means-ends tests that one sometimes forgets what the constitutional *text* even says.  As a refresher:  "Congress shall make no law . . . abridging the freedom of speech."  U.S. Const. amend. I.  Given that language, one might assume that a reviewing court would first inquire what "the freedom of speech" meant to the Founders and then ask whether the challenged law "abridg[es]"—*i.e.*, "lessen[s]" or "diminish[es]"— that freedom, *see* Noah Webster, *American Dictionary of the English Language* 4 (1st ed. 1828).  One would be wrong.

Here, as best I can tell, is where things stand in terms of First Amendment doctrine:  There seem to be two fixed stars.  At one pole, the government can ban certain forms of speech outright— defamation, incitement, obscenity, etc.—"because [they are] understood to fall outside 'the freedom of speech.'"  *Brown v. Ent. Merchs. Ass'n*, 564 U.S. 786, 822 (2011) (Thomas, J., dissenting) (quoting *Ashcroft v. Free Speech Coal.*, 535 U.S. 234, 245–46 (2002)).  At the other, speech restrictions "'based on viewpoint are prohibited,' seemingly as a *per se* matter."  *Speech First, Inc. v. Cartwright*, 32 F.4th 1110, 1126 (11th Cir. 2022) (quoting *Minn. Voters All. v. Mansky*, 138 S. Ct. 1876, 1885 (2018)).  In between, it's balancing tests all the way down.  A sampling:  For "content-based" restrictions, the government must satisfy strict scrutiny; it

must "show that its regulation is necessary to serve a compelling state interest and is narrowly drawn to achieve that end." *Ark. Writers' Project, Inc. v. Ragland*, 481 U.S. 221, 231 (1987). For "content-neutral" restrictions, by contrast, the "appropriate inquiry" is whether the law "is designed to serve a substantial governmental interest and allows for reasonable alternative avenues of communication." *City of Renton v. Playtime Theatres, Inc.*, 475 U.S. 41, 50 (1986). There's also the four-part test of *United States v. O'Brien*, which is deployed "when 'speech' and 'nonspeech' elements are combined in the same course of conduct." 391 U.S. 367, 376 (1968). And notably, those two less-rigorous tests—which have *both* been labeled "intermediate scrutiny"—operate differently. *See Lady J. Lingerie, Inc. v. City of Jacksonville*, 176 F.3d 1358, 1364 (11th Cir. 1999). Under the former, the means chosen by the government are considered sufficiently tailored if "*not substantially broader than necessary* to achieve the government's interest," *Ward v. Rock Against Racism*, 491 U.S. 781, 799–800 (1989) (emphasis added), while under the latter, the regulation must be "*no greater than is essential* to the furtherance" of the government's substantial interest, *O'Brien*, 391 U.S. at 377 (emphasis added). Then there's commercial speech—and more means-ends testing. The "scope" of direct restrictions on commercial speech must be "in proportion to the interest served" by the regulation, *Greater New Orleans Broad. Ass'n v. United States*, 527 U.S. 173, 188 (1999) (quotation omitted); *cf. Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n*, 447 U.S. 557, 566 (1980) ("not more extensive than is necessary to serve that interest"), whereas "indirect[]"

regulations need only survive rational-basis review, *see Glickman v. Wileman Bros. & Elliott, Inc.*, 521 U.S. 457, 469–70, 477 (1997). And finally—or probably not even finally—there's the fuzzy test that applies to the speech of government employees. For them, we just outright "balance" their "interests" in speaking as citizens on matters of public concern against "the interest of the State, as an employer." *Pickering v. Bd. of Educ.*, 391 U.S. 563, 568 (1968).

It's not just that the doctrine is exhausting—although it certainly is that. It's that the doctrine is judge-empowering and, I fear, freedom-diluting. If we, as judges, conclude—as I've said we should—that Second Amendment rights shouldn't be casually balanced away by reference to manipulable means-ends balancing tests, we might need to start asking the bigger question: On what basis can we do *exactly* that when dealing with other, equally fundamental rights?