# Supreme Court of Texas

No. 22-0427

Texas Department of Insurance and Cassie Brown, in her Official Capacity as Commissioner of the Texas Department of Insurance,

*Petitioners*,

v.

Stonewater Roofing, Ltd. Co.,

*Respondent*

On Petition for Review from the
Court of Appeals for the Seventh District of Texas

JUSTICE YOUNG, concurring.

I join the opinion of the Court but write separately to emphasize my understanding of two points with significance for future cases.

First, the federal due-process clause (or the Texas due-course clause) is generally satisfied when the State rationally regulates professional conduct to ensure competence and safeguard public safety. Stonewater does not challenge the statutory licensure and conflict-of-interest requirements on due-process grounds but as violations of the First Amendment's free-speech clause. Because of the Court's narrow statutory construction, any *speech* that that the statute touches is only incidental to *conduct*, the regulation of which is of even less concern to the First Amendment than it is to the due-process clause. I agree with

the Court, therefore, that today's case turns out to be easier than it might first have appeared. But I emphasize that, to benefit from today's holding, it is not enough for the State to *call* something conduct. The State wins today despite, not because of, its overweening theory of what constitutes "conduct" that it may subject to professional regulation.

Second, I am concerned about what comes next. Not every case will be so easy. It will not be possible or proper to construe every statute that regulates professions as only incidentally burdening speech and targeting only non-expressive conduct. What then? As it stands today, the relevant First Amendment doctrine is a mind-numbing morass of tangled precedents developed in contexts very different from professional licensing. There is just enough of a whiff of original meaning to disguise a stew of ad hoc conclusions—the way that heavy sauces can fool diners into enjoying meat that sat for hours out in the sun.

The doctrine as we have it seems poorly equipped to address legitimate public-licensing regulation that *does* affect speech or expressive conduct more than "incidentally." The outcome is basically determined at the first move: if conduct, the regulation survives; if speech, it is doomed. Worse, the conduct-speech dichotomy is, to put it mildly, rather malleable. The First Amendment can surely be obeyed with better rationales—and recent cases provide some reason for hope that the U.S. Supreme Court will clarify and rationalize its jurisprudence. If so, the speech implications for professional licensure will likewise become clearer.

## I

The State's theory of its authority to impose professional licenses without violating the First Amendment is too vast.

**A**

The normal framework for challenging professional licensure sounds in due process. "Competence" and "public safety" are the kinds of neutral criteria that the police power allows the State to invoke to defend regulations like licensing regimes. "[T]he state may have an interest in shielding the public against the untrustworthy, the incompetent, or the irresponsible, or against unauthorized representation of agency. A usual method of performing this function is through a licensing system." *Thomas v. Collins*, 323 U.S. 516, 545 (1945) (Jackson, J., concurring). Stonewater does not contend that the statutory provisions it challenges fail this constitutional requirement. We must assume that the licensing and conflict-of-interest provisions are important and rational measures to protect the public, and indeed various amici have explained in detail why this is so. *See, e.g.*, Brief for American Property Casualty Insurance Association et al. as Amici Curiae 15–17 (highlighting the risks to the public of unlicensed and unregulated contractors pocketing money from settled insurance claims).

Legislation must satisfy not only due process, of course, but also every other constitutional requirement. And with the expansion of professional licensing to a greater number of professions, challenges like this one increasingly sound in free speech. *Asserting* that a licensure requirement burdens protected speech does not make it so, but neither is it inherently implausible. Imagine licensing not just the structural engineer who will ensure that a new cathedral does not collapse, but also the bishop who will preach in it. Or not just the truck driver who transports stacks of hot-off-the-press newspapers, but the journalists who

3

write the articles printed in them. Likewise for poets, painters, political consultants, and on and on. Would such licenses satisfy the free-speech clause (and perhaps other clauses)?

The scope of the State's theory is not entirely clear. But, as I understand it, that theory encompasses examples like these by converting speech into conduct, much as nominalizations convert verbs into nouns: the "act" of doing a job that involves speech, especially when it is a *paid* "act." Under this view, only "conduct" is reached—"journalism" becomes the "act" of taking money from employers to produce news articles for those employers, for instance. The State's theory seems to be that it gets to decide who is competent to undertake *conduct* and can impose a licensure requirement without offending—or even implicating—the free-speech clause. The State's argument appears to at least agree that "pure speech" cannot be nominalized into mere conduct to evade First-Amendment review—but I am not sure the State truly concedes that any profession involves "pure speech." It describes "prototypical professional conduct" as "taking defined *actions* on behalf of a client in exchange for payment."

The problem, therefore, is not that the State denies that expression is protected. Rather, it is how broadly the State may seek to define "conduct." And the more broadly one defines "conduct"—using the formula "*acting* as [fill-in-the-blank]"—the less room there is for speech. The less speech, the less likely that any regulation is subject to an exacting judicial inquiry. Thus, even accepting the true rule that the First Amendment permits only incidental burdens on speech without heightening the scrutiny, the effect of that rule depends entirely on what

4

we *classify* as speech, conduct, expressive, non-expressive, and the like.

Said differently, it is understandable—in the context of someone being *paid* to do a job, after all—to regard the resulting work as just paid-for conduct rather than something that implicates the First Amendment. In many contexts that is true enough. But in others, it is just a way to subtly erase the role of the First Amendment. Jack Phillips was *paid* to make cakes—and so the State of Colorado did not think it was a big deal to demand that he toe the line, despite the expressive nature of the custom cakes that he designed to convey deep meaning. *See Masterpiece Cakeshop, Ltd. v. Colo. Civ. Rts. Comm'n*, 584 U.S. 617 (2018); *see also 303 Creative LLC v. Elenis*, 600 U.S. 570 (2023) (protecting a graphic-design maker from being compelled to create expressive designs when the designer disagrees with the messages the designs convey).

Our conduct-speech dichotomy lends itself to confusion and abuse because conduct and speech are not hermetically sealed categories. Burning a piece of cloth is conduct; banning the burning of cloth in public spaces regulates that conduct. But banning burning pieces of cloth in public only if the cloth has alternating red and white stripes and a blue field studded with fifty white stars is to regulate conduct that is imbued with speech. *See Texas v. Johnson*, 491 U.S. 397 (1989). I make such elementary points precisely because the State's theory—and I guess I cannot blame it for trying—seems largely to elide, or at least downplay, these fundamental principles. Its focus is on "acting" in a given way, transforming it into "conduct" that can be regulated, period.

I understand the Court to reject the State's blunt theory, too. The most important word of the most important sentence in the opinion, to

5

me, is "nonexpressive": "The gravamen of the defined profession is the *role* a person *plays* in a *nonexpressive* commercial transaction, not what anyone may or may not *say*." *Ante* at 14. Without the word "nonexpressive," I do not see why the State could not require licenses and impose restrictions (like those here) for portraitists, political consultants, journalists, ministers of the Gospel, and so many others, including as to the parts of their jobs that only convey messages.

The Court also, however, emphasizes that, in this case, "the profession's actuating activity and dominant focus is employment in a representative (or agency) capacity." *Id*. Although I join the Court's opinion, I do so only on the understanding that this sentiment, which is sprinkled throughout, is understood to address *nonexpressive* conduct. To be honest, I doubt that "representative (or agency) capacity," by itself, has anything to do with the First Amendment analysis. Speech and expressive conduct are no less protected because they are made on behalf of another or for compensation. "[T]he First Amendment extends to all persons engaged in expressive conduct, including those who seek profit (such as speechwriters, artists, and website designers)." *303 Creative*, 600 U.S. at 600. "It is well settled that a speaker's rights are not lost merely because compensation is received; a speaker is no less a speaker because he or she is paid to speak." *Riley v. Nat'l Fed'n. of the Blind of N.C., Inc.*, 487 U.S. 781, 801 (1988).

Agency, in my view, is therefore all but irrelevant to the First Amendment analysis—except that it is too easily looked upon to abridge First-Amendment rights. Regulating *expressive* conduct taken "in a representative (or agency) capacity" is subject to no less scrutiny than the

6

same conduct taken in a non-representative or non-agency capacity. It is not the details of the commercial relationship that matter, but whether *expression* is at the core of the undertaking.

Because the Court concludes that the statute, as construed, regulates *non*expressive conduct, there is no option but to reverse. As I describe below, however, a harder case will come to us, sooner or later. It could even come in this context—the legislature could, for example, amend the law at issue in a way that really does constrict speech.

**B**

Today's narrow statutory construction allows the State to bar Stonewater from undertaking Stonewater's desired conduct—adjusting insurance claims while financially benefiting from that work in a different capacity. But today's construction allows Stonewater to do quite a lot that the government may want to forbid—including discussing, in detail, the damage and costs of repair with the insurance company. *See ante* at 24 (opinion of the Court); *ante* at 2–3 (Blacklock, J., concurring in the judgment). This narrow construction avoids serious constitutional problems.

Even if the legislature amends the law to impose greater restrictions on parties like Stonewater, any burdens on speech may still be merely incidental to the conduct that the Court describes. The vast majority of states, as the Court observes, *see ante* at 2, 6 n.17, do what the two challenged statutes do here: (1) require that insurance adjusters be licensed and (2) prevent conflict-of-interest problems by prohibiting dual-capacity arrangements (preventing the same actor from being both a contractor and an insurance adjuster).

7

The State's argument about why its regulation is permissible, even with a less narrowly construed statute, emphasizes cases like the Eleventh Circuit's decision in *Del Castillo v. Secretary, Florida Department of Health*, 26 F.4th 1214 (11th Cir. 2022). That case upheld a Florida law that regulates the practice of nutrition and dietetics, including "advising and assisting individuals or groups on appropriate nutrition intake by integrating information from the nutrition assessment." Fla. Stat. § 468.503(10). Del Castillo alleged that the law violated her First Amendment free-speech rights. The Eleventh Circuit held that "[a]ssessing a client's nutrition needs, conducting nutrition research, developing a nutrition care system, and integrating information from a nutrition assessment are not speech. They are 'occupational conduct'; they're what a dietician or nutritionist does as part of her professional services." *Del Castillo*, 26 F.4th at 1225–26. The court therefore concluded that the licensing scheme for dieticians and nutritionists regulated professional conduct and only incidentally burdened speech. *Id.* at 1226. The First Amendment, it held, did not require heightened scrutiny. *Id.*

If a dietician's "advising" or "counseling" people about nutrition is not speech, then public insurance adjusting is not either. Like providing nutrition and diet counseling, public insurance adjusters must engage mainly in *conduct* for which communicating with an insurer is only incidental. The Court recognizes the important conduct involved in settling an insured's claim: "evaluating insurance coverage, assessing property value, assessing property damage, and calculating repair costs" and ultimately "payment, satisfaction, or final adjustment" of the damage claim. *Ante* at 15–16. Stonewater's position certainly does not lack force,

8

but especially as the Court construes the statute, communicating the value of the claim to the insurer is not remotely the defining characteristic of a public insurance adjuster's job. It is as incidental to professional conduct as speech can be—far more incidental than communicating a diet and nutrition plan formulated according to professional standards, which is why the Eleventh Circuit reached the result it did in *Del Castillo*. In other words, if the dietician's job is mainly to *figure out* what the health and nutrition needs of a client are, the public insurance adjuster's primary role is to *figure out* what a proper insurance claim is in light of a damage-causing event.

Assessing the constitutionality of the specific provisions Stonewater challenges—Insurance Code §§ 4102.051(a) and 4102.163(a)— is therefore straightforward. Section 4102.051(a) bars an individual from acting or holding himself out as a public insurance adjuster without a license. The first half of this prohibition is constitutional under the analysis laid out above. I agree with the Court and with Justice Blacklock that the latter part of this prohibition is constitutional too—holding oneself out as an adjuster restricts speech, but it merely bars *false* commercial statements, which the Constitution does not protect. *Ante* at 12–13 (opinion of the Court); *ante* at 3 (Blacklock, J., concurring in judgment); *see, e.g.*, *Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y.*, 447 U.S. 557, 563–64, 566 (1980).

In my view, at least as to *this* case, the Court correctly concludes that there is no colorable basis for a constitutional challenge. To prevail, the State does not *need* such an overreaching theory.

9

## II

On the other hand, it is not clear that *Del Castillo* is exactly right. Really, *no* speech interests are involved in a dietician giving nutrition advice and counseling? That work is nothing but *nonexpressive conduct*?

Is the conduct–speech divide even the right line to look for—does it ask the right questions? Current First Amendment doctrine does not, formally at least, care too much about the context in which speech is infringed, including if it is a statute imposing professional-licensure requirements that does so. "[T]he traditional conduct-versus-speech dichotomy" remains the doctrinally mandated way to determine whether such a requirement violates the First Amendment. *Vizaline, L.L.C. v. Tracy*, 949 F.3d 927, 932 (5th Cir. 2020) (citing *Nat'l Inst. of Fam. & Life Advocs. v. Becerra*, 585 U.S. 755, 771–75 (2018) (*NIFLA*)).

In cases like this one that challenge a professional-licensure regime, therefore, courts must ask whether the regulation burdens (1) speech, (2) conduct, or (3) speech incidental to conduct. The answer to this question may raise additional questions—if the answer is conduct, for example, whether it is inherently *expressive* conduct. The Court today concludes that *this* case is easy. Even so, drawing the line is often hard. *Del Castillo* strikes me as harder than today's case—but even assuming that case got it just right, cases pushing the line are coming.

## A

When they come, how will courts react? One problem is that drawing the line is somewhat questionable. The "enterprise of labeling certain verbal or written communications 'speech' and others 'conduct' is unprincipled and susceptible to manipulation." *King v. Governor, N.J.*,

10

767 F.3d 216, 228 (3d Cir. 2014), *abrogated on other grounds by NIFLA*, 585 U.S. 755. The Eleventh Circuit—which decided *Del Castillo*—has made the exact same observation. *Wollschlaeger v. Governor, Fla.*, 848 F.3d 1293, 1308 (11th Cir. 2017) (en banc) (quoting *King*, 767 F.3d at 228); *see also, e.g.*, *Otto v. City of Boca Raton*, 981 F.3d 854, 865 (11th Cir. 2020). If courts must decide these cases by drawing this line, and if drawing this line is a manipulable exercise, then it may turn out that First Amendment jurisprudence *does* care an awful lot about the context in which a challenge arises, even if the formal doctrine purports to be the same always and everywhere.

The importance of protecting speech means that courts should be wary of this conduct-speech dichotomy, and particularly of too quickly or without rigorous reasons concluding that a regulation touches just conduct. It is precisely because the doctrine formally does not distinguish among contexts that a lack of discipline in this area is troubling. If it is comparatively easy to hold that any professional licensure is "just conduct," what will stop regulation of the same "conduct" *outside* that regulatory context? Justice Cardozo wrote of "the tendency of a principle to expand itself to the limit of its logic." Benjamin N. Cardozo, *The Nature of the Judicial Process* 51 (1921). Where is the limit here, exactly, that does not threaten individual liberties more generally? This concern is one of the reasons why I observed above that it is a mistake to be led into thinking that there is any lesser protection for those who are engaged in remunerative conduct in an "agency" or "representative" capacity.

**B**

The distinction between speech and conduct is also significant

11

because it dictates the appropriate level of scrutiny that courts must apply. A regulation invites strict scrutiny, which is typically fatal, when the regulation "'targets speech based on its communicative content'—that is, if it 'applies to particular speech because of the topic discussed or the idea or message expressed.'" *City of Austin v. Reagan Nat'l Advert. of Austin, LLC*, 596 U.S. 61, 69 (2022) (alteration omitted) (quoting *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015)). Regulation of a different profession—one that involves expressive conduct (perhaps the legal or medical professions)—might demand *O'Brien*'s intermediate scrutiny, which is sometimes fatal but possible to survive. *See United States v. O'Brien*, 391 U.S. 367 (1968). Or we may apply no scrutiny under the First Amendment at all when, as here, the target is legitimately seen as *nonexpressive* conduct. *See, e.g., Hines v. Alldredge*, 783 F.3d 197, 201–02 (5th Cir. 2015) (citing *Lowe v. SEC*, 472 U.S. 181, 211 (1985) (White, J., concurring in the result)), *abrogated on other grounds by NIFLA*, 585 U.S. 755. In such cases, only rational-basis review under the due-process clause remains—and it is rare indeed for a governmental action to succumb to that level of scrutiny.

Combining the conduct-speech dichotomy's apparent malleability with the all-but-determinative level of scrutiny yields serious problems for courts, the other branches of government, and the regulated public. Public suspicion that courts work backwards—that they categorize laws so that the desired level of scrutiny applies, not the other way around—could follow from a perception, whether fair or not, that this endeavor lends itself both to inconsistent categorization (speech, expressive conduct, neither) and to wildly divergent results based on the chosen

categorization. At the least, the very risk of inconsistency makes the whole endeavor open to the charge.

I am hardly alone in wondering if the tiers of scrutiny are moored in the Constitution's text and original meaning. Jurists from every perspective have expressed concern. "[T]he label the Court affixes to its level of scrutiny in assessing whether the government can restrict a given right—be it 'rational basis,' intermediate, strict, or *something* else—is increasingly a meaningless formalism. As the Court applies whatever standard it likes to any given case, nothing but empty words separates our constitutional decisions from judicial fiat." *Whole Woman's Health v. Hellerstedt*, 136 S. Ct. 2292, 2326–27 (2016) (Thomas, J., dissenting) (emphasis added). Compounding the problem, judges treat the tiers of scrutiny as "guidelines informing [their] approach to the case at hand, not tests to be mechanically applied." *Williams-Yulee v. Fla. Bar*, 575 U.S. 433, 457 (2015) (Breyer, J., concurring). "Such an amorphous inquiry risks . . . judges upholding or invalidating . . . laws at will—without respect to the original public meaning of the" relevant constitutional provision. *United States v. Jimenez-Shilon*, 34 F.4th 1042, 1051–52 (11th Cir. 2022) (Newsom, J., concurring).

Scholars have reasonably doubted whether the tiers of scrutiny "have [any] basis in the text or original meaning of the Constitution. They emerged as a political solution invented by the justices to navigate internal factions at the Supreme Court, and they do not withstand critical analysis even on their own terms." Joel Alicea & John D. Ohlendorf, *Against the Tiers of Constitutional Scrutiny*, 41 Nat'l Affs. 72, 73 (2019). Using tiers of scrutiny to "displace longstanding national traditions as the

primary determinant of what the Constitution means" is troubling at best. *United States v. Virginia*, 518 U.S. 515, 570 (1996) (Scalia, J., dissenting).

Today's Supreme Court—some Justices more than others—appears to have found new doubts about the proper role of the tiers of scrutiny. *See, e.g., N.Y. State Rifle & Pistol Ass'n v. Bruen* 597 U.S. 1 (2022); *Students for Fair Admissions, Inc. v. President & Fellows of Harv. Coll.*, 600 U.S. 181 (2023) (Thomas, J., concurring). Indeed, the *Bruen* majority claimed that its new text, history, and tradition test "comports" and "accords with" how the Court protects free-speech rights. 597 U.S. at 24–25. That is at least partially true. The Court has looked at history to define categories of unprotected or lesser-protected speech. *See Tingley v. Ferguson*, 144 S. Ct. 33, 35 (2023) (Thomas, J., dissenting from denial of certiorari) ("Accordingly, the Court has instructed that states may not 'impose content-based restrictions on speech without "persuasive evidence . . . of a long (if heretofore unrecognized) tradition" to that effect.'" (quoting *NIFLA*, 585 U.S. at 767)). In other contexts too, like the religion clauses, the Court has construed the scope of the asserted right "by 'reference to historical practices and understandings.'" *Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 510 (2022) (quoting *Town of Greece v. Galloway*, 572 U.S. 565, 576 (2014)).

But the Supreme Court has continued to embrace balancing tests to determine whether a regulation imposed on protected speech is constitutional—and so, therefore, do the lower courts. Decreasing the role of these balancing tests and increasing consideration of the history of regulating certain professions, at least as a first step and in this kind of context, might bring the judicial approach to First Amendment

challenges to professional-licensure regulations more in line with how we assess due-process claims. After all, *that* doctrine is the one under which professional-licensure challenges have traditionally been raised. The U.S. Supreme Court has said that "the Due Process Clause specially protects those fundamental rights and liberties which are, objectively, deeply rooted in this Nation's history and tradition." *Washington v. Glucksberg*, 521 U.S. 702, 720–21 (1997) (internal quotation marks omitted). Perhaps a similar inquiry as a starting point might be a good first step in isolating novel licensure regimes that warrant First Amendment scrutiny from those that have clear historical roots such that heightened scrutiny would be more problematic (or more needed).

Whether a better and clearer approach to assessing First Amendment challenges will emerge, even in limited contexts like professional licensure, remains to be seen. I reserve further thoughts for future cases, if they come. This Court, like all courts, must of course follow the Supreme Court's First Amendment guidance, and I hope that Court will continue to refine its jurisprudence in this area. But it is for this Court to determine the proper analytical framework for cases that arise under the Texas Constitution's free-speech clause, *see* Tex. Const. art. I, § 8—if parties raise, research, preserve, and press contentions under that provision, which Stonewater did not.

Evan A. Young
Justice

**OPINION FILED:** June 7, 2024

15