FOR PUBLICATION

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,

*Plaintiff - Appellee,*

v.

OSCAR VAZQUEZ-RAMIREZ,

*Defendant - Appellant.*

No. 24-3544

D.C. No.
2:22-cr-00087-
RMP-1

OPINION

Appeal from the United States District Court
for the Eastern District of Washington
Rosanna Malouf Peterson, District Judge, Presiding

Argued and Submitted June 2, 2025
Seattle, Washington

Filed January 2, 2026

Before: Johnnie B. Rawlinson, Daniel A. Bress, and Patrick
J. Bumatay, Circuit Judges.

Per Curiam Opinion;
Concurrence by Judge Bumatay

# SUMMARY[*]

## Criminal Law

The panel affirmed Oscar Vazquez-Ramirez's conviction for violating 18 U.S.C. § 922(g)(5)(A), which prohibits persons "illegally or unlawfully in the United States" from possessing a firearm.

Vazquez-Ramirez moved to dismiss the indictment, raising an as-applied Second Amendment challenge to § 922(g)(5)(A). The district court denied the motion.

The panel concluded that this court's previous holding that Second Amendment challenges to § 922(g)(5)(A) are subject to intermediate scrutiny, *see United States v. Torres*, 911 F.3d 1253, 1263 (9th Cir. 2019), is clearly irreconcilable with *N.Y. State Rifle & Pistol Assoc'n v. Bruen*, 597 U.S. 1, 24 (2022), and is overruled.

Applying *Bruen*'s two-step framework for evaluating Second Amendment challenges, the panel (1) assumed without deciding that noncitizens illegally present in the United States could be considered part of "the people" protected by the Second Amendment, but (2) concluded that the government met its burden to show that § 922(g)(5)(A) is consistent with the nation's historical tradition of firearm regulation. Thus, Vazquez-Ramirez's as-applied challenge fails.

Concurring in the judgment, Judge Bumatay would hold that "the people" refers only to "members of the [nation's]

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

political community," which categorically excludes illegal aliens, and that § 922(g)(5)(A) prosecutions thus don't implicate the Constitution's "plain text" and are not subject to a Second Amendment challenge.

## COUNSEL

Michael J. Ellis (argued), Assistant United States Attorney; Vanessa R. Waldref, United States Attorney; Office of the United States Attorney, United States Department of Justice, Spokane, Washington; for Plaintiff-Appellee.

Carter L. Powers Beggs (argued), Assistant Federal Defender, Federal Public Defenders of Eastern Washington and Idaho, Spokane, Washington; John B. McEntire IV, Connelly Law Offices PLLC, Tacoma, Washington; for Defendant-Appellant.

## OPINION

PER CURIAM:

Oscar Vazquez-Ramirez brings a Second Amendment challenge to his conviction under 18 U.S.C. § 922(g)(5)(A), which prohibits persons "illegally or unlawfully in the United States" from possessing a firearm. We join all our sister circuits in concluding that the Second Amendment does not invalidate § 922(g)(5)(A). *See United States v. Perez*, 6 F.4th 448, 450 (2d Cir. 2021); *United States v. Carpio-Leon*, 701 F.3d 974, 975 (4th Cir. 2012); *United States v. Portillo-Munoz*, 643 F.3d 437, 442 (5th Cir. 2011); *United States v. Escobar-Temal*, No. 24-5668, 2025 WL 3632831, at *12 (6th Cir. Dec. 15, 2025); *United States v. Carbajal-Flores*, 143 F.4th 877, 889 (7th Cir. 2025); *United States v. Flores*, 663 F.3d 1022 (8th Cir. 2011); *United States v. Huitron-Guizar*, 678 F.3d 1164, 1170 (10th Cir. 2012); *United States v. Jimenez-Shilon*, 34 F.4th 1042, 1050 (11th Cir. 2022). Thus, Vazquez-Ramirez's as-applied challenge to § 922(g)(5)(A) fails.

## I.

Born in Mexico, Oscar Vazquez-Ramirez came to the United States unlawfully when he was seven years old. Vazquez-Ramirez is not a United States citizen and has no legal immigration status in the country. In December 2021, Vazquez-Ramirez was pulled over in Othello, Washington, for failing to yield at a crosswalk. At the time, Vazquez-Ramirez had a firearm in his waistband. He was then arrested for driving under the influence of alcohol and for unlawful possession of a firearm.

In July 2022, Vazquez-Ramirez was charged in a single-count federal indictment with 18 U.S.C. § 922(g)(5)(A)—"Unlawful Alien in Possession of a Firearm and Ammunition." Vazquez-Ramirez moved to dismiss his indictment, raising an as-applied Second Amendment challenge to § 922(g)(5)(A). The district court denied the motion. Afterward, Vazquez-Ramirez entered a conditional guilty plea, preserving his right to appeal the Second Amendment ruling. The district court sentenced him to five years' probation.

Vazquez-Ramirez now appeals his conviction, which we review de novo. *See United States v. Oliver*, 41 F.4th 1093, 1097 (9th Cir. 2022).

## II.

Section 922(g)(5)(A) prohibits "any person . . . who being an alien—is illegally or unlawfully in the United States" from possessing any firearm or ammunition. 18 U.S.C. § 922(g)(5)(A). Although Vazquez-Ramirez doesn't contest that he is "illegally or unlawfully in the United States," he argues that, as a long-time resident of the country, he is entitled to the protection of the Second Amendment.

While we previously held that Second Amendment challenges to § 922(g)(5)(A) are subject to intermediate scrutiny, *see United States v. Torres*, 911 F.3d 1253, 1263 (9th Cir. 2019), that ruling is "clearly irreconcilable" with *N.Y. State Rifle & Pistol Assoc'n v. Bruen*, 597 U.S. 1, 24 (2022), and is overruled. *See Miller v. Gammie*, 335 F.3d 889, 900 (9th Cir. 2003) (en banc).

*Bruen* establishes a two-step framework for evaluating Second Amendment challenges. First, we consider "whether the Second Amendment's plain text covers an individual's

proposed course of conduct." *United States v. Duarte*, 137 F.4th 743, 752 (9th Cir. 2025) (en banc) (simplified). Second, if the conduct is covered by its plain text, "the Second Amendment presumptively protects that conduct[, and] [t]he Government then bears the burden of justifying the challenged regulation by showing that it is consistent with our nation's historical tradition of firearm regulation." *Id.* (simplified).

Under *Bruen*'s second step, we "must engage in analogical reasoning to determine whether the modern regulation is relevantly similar to historical laws and traditions . . . so as to evince[ ] a comparable tradition of regulation." *Id.* at 755 (simplified). In conducting this analogical reasoning, we examine: "(1) 'whether modern and historical regulations impose a comparable burden on the right of armed self-defense' (the 'how'); and (2) 'whether that burden is comparably justified' (the 'why')." *Id.* (quoting *Bruen*, 597 U.S. at 29). This examination requires only "a well-established and representative historical *analogue*, not a historical *twin.*" *Id.* (quoting *Bruen*, 597 U.S. at 30). In the end, "'the appropriate analysis involves considering whether the challenged regulation is consistent with the *principles* that underpin our regulatory tradition.'" *Id.* (quoting *United States v. Rahimi*, 602 U.S. 680, 692 (2024) (emphasis added)).

As it is not necessary to resolve the issue in this case, like several of our sister circuits, we will assume without deciding that noncitizens illegally present in the United States could be considered part of "the people" protected by the Second Amendment. *See Perez*, 6 F.4th at 453; *Jimenez-Shilon*, 34 F.4th at 1045–46; *Carbajal-Flores*, 143 F.4th at 882. And like our sister circuits, we conclude that the

government has met its burden to show that § 922(g)(5)(A) is consistent with the nation's historical tradition of firearm regulation. *See Jimenez-Shilon*, 34 F.4th at 1049–50; *Carbajal-Flores*, 143 F.4th at 888.

## A.

To determine whether our historical tradition supports a modern federal firearms regulation, we consider "primarily . . . historical regulations extant when the Second and Fourteenth Amendments were adopted in 1791 and 1868, respectively," and "pre-and post-ratification history to the extent that it does not contravene founding-era evidence." *Duarte*, 137 F.4th at 755. Here, common law, pre-ratification, and post-ratification history all show a tradition of the government permissibly restricting the firearms rights of non-citizens.

1. First, "[i]n the English tradition, one's alien status carried with it a smaller basket of rights." *Carbajal-Flores,* 143 F.4th at 883. The common law distinguished between "aliens and natural-born subjects." 1 William Blackstone, *Commentaries on the Laws of England* \*354 (1765). Natural-born subjects were born in the king's dominion and owed "perpetual" allegiance to the king. *Id.* at 354, 357. In exchange for that allegiance, natural-born subjects received the "protection which the king affords the subject." *Id*. at 354. Thus, natural subjects had a "great variety of rights." *Id.* at 359. In contrast, "aliens" were born outside of the king's dominion and owed merely "[l]ocal allegiance" to the king, which existed only while the alien resided in the dominion. *Id.* at 358. This "local and temporary" allegiance meant aliens were entitled to a "much more circumscribed" list of rights. *Id.* at 359.

The right to keep and bear arms was among those rights circumscribed for non-citizens. For example, an English statute prohibited non-landowners from having or keeping "Guns, Bowes" or other hunting equipment. An Act for the Better Preservation of the Game, 22 & 23 Car. 2, c. 25 (1671). This effectively prevented "aliens" from owning firearms because they could not permanently own land. *See* 1 Blackstone, *Commentaries* at *360; *see also Jimenez-Shilon*, 34 F.4th at 1046 (citing sources). According to Blackstone, "aliens" could not purchase land for their own use because doing so would expose the nation to "foreign influence." *Id*. at 360–61. Aliens could only gain the right to land ownership, and with it the right to arms, through naturalization. *Carbajal-Flores*, 143 F.4th at 884.

Similarly, several statutes restricted gun ownership for English Catholics, who "were perceived as resident enemy aliens because they owed an allegiance to a foreign sovereign, the Pope." *Id.* For example, one law made it a crime for Catholics to possess firearms and punished violators with forfeiture of their firearms and imprisonment. An Act for the Better Securing the Government by Disarming Papists and Reputed Papists, 1 W. & M., Sess. 1 (1689). For the English, the fact "[t]hat '[Catholics] acknowledge[d] a foreign power, superior to the sovereignty of the kingdom,' meant Catholics were not entitled to bear arms as 'good subjects' were." *Carbajal-Flores*, 143 F.4th at 884 (quoting C. Kevin Marshall, *Why Can't Martha Stewart Have a Gun?*, 32 Harv. J.L. & Pub. Pol'y 695, 722–23 (2009)). Although laws such as this would encounter problems "under *other* parts" our Constitution, they are still "reflective" of history and tradition. *Duarte*, 137 F.4th at 760. Thus, "[a]ll told, the English tradition establishes a historical pattern of disarming persons who lacked

allegiance to the sovereign," which included non-naturalized aliens living in England. *Carbajal-Flores*, 143 F.4th at 884.

2. Second, pre-ratification colonial statutes similarly restricted the gun ownership of non-citizens and other individuals with questionable loyalties. *See Carbajal-Flores*, 143 F.4th at 884–86; *Jimenez-Shilon*, 34 F.4th at 1047–48. Several colonies, for example, prohibited Englishmen from giving guns or ammunition to Native Americans. *See, e.g., Mass. Gen. Laws*, ch. 58, § 2 (1633), reprinted in *The Charters and General Laws of the Colony and Province of Massachusetts Bay* 133 (T.B. Wait & Co. 1814); *The Public Records of the Colony of Connecticut, 1665*, 80, 529 (Brown & Parsons 1850); Nathaniel B. Shurtleff & David Pulsifer, eds., 5 *Records of the Colony of New Plymouth, in New England,* 173 (AMS Press 1968) ("[Giving arms] to the Indians is pnisious [sic] and destructive to the English"); *see generally* Joseph Blocher & Caitlin Carberry, *Historical Gun Laws Targeting "Dangerous" Groups and Outsiders*, Duke Law School Public Law & Legal Theory Series No. 2020-80 (2020).

After the Revolution, States passed statutes depriving firearms from those who refused to swear allegiance and fidelity to their respective State. *See Duarte,* 137 F.4th at 765 & n.5 (Collins, J. concurring) (compiling State "laws disarming loyalists or those who refused to take loyalty oaths"). Take a Pennsylvania law that found it "very improper and dangerous that *persons disaffected to the liberty and independence of this state* should possess or have in their keeping, or elsewhere, any firearms, or other weapons used in war, or any gun powder[.]" Pa. Laws 198, 198–99 §§ 4–5 (1779) (emphasis added). So the State was "empowered to disarm any person who shall not have taken

any oath or affirmation of allegiance to this or any other state." *Id.*

By tying firearm possession directly to national allegiance, our Founding generation made the "disarmament of groups associated with foreign elements" "an early feature" of our historical tradition of gun regulation. Pratheepan Gulasekaram, "*The People" of the Second Amendment: Citizenship and the Right to Bear Arms*, 85 N.Y.U. L. Rev. 1521, 1548–49 (2010).

3. Third, our post-ratification history confirms the tradition of disarming noncitizens. Justice Story interpreted the Second Amendment right as "[t]he right of the *citizens* to keep and bear arms . . . against the usurpation and arbitrary power of rulers." 3 Joseph Story, *Commentaries on the Constitution of the United States* § 1890 (1833) (emphasis added). And many States prohibited non-citizens from possessing firearms because of their alienage or lack of allegiance. *See Jimenez-Shilon*, 34 F.4th at 1047; *Carbajal-Flores*, 143 F.4th at 886; *see also Kanter v. Barr,* 919 F.3d 437, 457–58 (7th Cir. 2019) (Barrett, J. dissenting).

\* \* \*

We thus agree with the Seventh Circuit that, "[f]rom the common law onward, aliens have historically been disarmed unless and until they swore an oath of allegiance to the sovereign." *Carbajal-Flores*, 143 F.4th at 888.

**B.**

Section 922(g)(5)(A) fits comfortably with the "how" and the "why" of our Nation's regulatory tradition of disarming noncitizens and those who have not sworn allegiance to our country. *See Rahimi*, 602 U.S. at 692. First, the federal statute has a similar "how" to historical

statutes. It disarms persons unwilling or unable to swear the oath of allegiance and loyalty to the United States. *See Jimenez-Shilon*, 34 F.4th at 1048. "The way § 922(g)(5)(A) operates maps onto [our] tradition[,]" disarming those who have illegally entered the country, and foregone naturalization. *Carbajal-Flores*, 143 F.4th at 888. Second, § 922(g)(5)(A) has a similar "why" to the historical tradition. We have historically disarmed those who, by their lack of allegiance, our country has deemed untrustworthy or potentially dangerous. *NRA v. Bureau of Alcohol, Tobacco, Firearms, and Explosives*, 700 F.3d 185, 200 (5th Cir. 2012); *Kanter*, 919 F.3d at 457 (Barrett, J., dissenting). Noncitizens illegally present in the United States are "person[s] whose unregistered presence in this country, without more, constitutes a crime." *INS v. Lopez-Mendoza*, 468 U.S. 1032, 1047 (1984). Aliens cannot "surreptitiously enter a foreign nation in violation of the immigration prerogatives of the sovereign and expect to receive all the rights and protections of the citizenry." *Jimenez-Shilon*, 34 F.4th at 1049.

Accordingly, Vazquez-Ramirez's as-applied challenge to § 922(g)(5)(A) fails.

## III.

For the foregoing reasons, we affirm the denial of the motion to dismiss the indictment.

**AFFIRMED.**

BUMATAY, Circuit Judge, concurring in the judgment:

The Second Amendment declares that "[a] well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. By its plain text, the Second Amendment protects only "the people." But who are "the people" entitled to the Second Amendment right? Does "the people" include aliens "illegally or unlawfully in the United States"—the basis for prosecution under 18 U.S.C. § 922(g)(5)(A)?

The per curiam opinion assumes illegal aliens are part of the "people" but concludes that our historical tradition justifies disarming them. I analyze the question differently. Based on the Second Amendment's text, I would hold that "the people" refers only to "members of the [Nation's] political community," *District of Columbia v. Heller*, 554 U.S. 570, 580 (2008), which categorically excludes illegal aliens. Thus, § 922(g)(5)(A) prosecutions don't implicate the Constitution's "plain text" and are not subject to a Second Amendment challenge. *See N.Y. State Rifle & Pistol Assoc'n v. Bruen*, 597 U.S. 1, 24 (2022).

**I.**

Under *Bruen*, we first ask whether "the Second Amendment's plain text covers [the defendant's] conduct." *Id.* If not, the Second Amendment inquiry ends, and we need not go any further. I would end this case at the first step.

**A.**

The Second Amendment expressly protects only "the people" from the infringement of the right to keep and bear arms. Based on the Constitution's text, structure, and

history, the phrase "the people" is a "term of art" referring only to the "members of the [Nation's] political community." *Heller*, 554 U.S. at 580 (quoting *United States v. Verdugo-Urquidez*, 494 U.S. 259, 265 (1990)). Whoever is included in the American "political community," it cannot include illegal aliens, who owe their allegiance to another sovereign and whose very presence in the country violates federal law. *See* 8 U.S.C. § 1325.

### *First Principles*

To understand the Constitution's use of "the people," one must first understand the American constitutional project's philosophical foundations. Our Constitution was not ratified on a blank slate. Instead, it resulted from a revolutionary movement firmly rooted in the principles of popular sovereignty and self-government. Placing the Constitution in the context of these background principles shows that "the people" consists only of the sovereign political community.

The revolutionary generation was well-versed in the political philosophy of the Enlightenment, which imbued special meaning in the term "the people." "The founding-era," for instance, "was heavily influenced by John Locke" and cited his works in "'pamphlet after pamphlet'[.]" *Obergefell v. Hodges*, 576 U.S. 644, 726 (2015) (Thomas, J., dissenting) (quoting Bernard Bailyn, The Ideological Origin of the American Revolution 27 (1967)). Locke believed that government must operate "for no other end ultimately but the good of the people" and derives its legitimacy from "the consent of the people[.]" John Locke, The Second Treatise of Government § 142 (1689) (reprinted in John Locke Political Writings (David Wootton ed.) 335 (1993)). Because government derives its legitimacy from

consent, "the people [retain] a supreme power to remove or alter" it. *Id.* § 149, pg. 337. In this way, then, "the people" are "always the supreme power." *Id.* § 149, pg. 338. For Locke, "the body of the people" is the fundamental authority in political society. *Id.* § 242, pg. 386.

Montesquieu, who also viewed the "people" as a term of art central to legitimate government, was similarly influential. *See* Gordon S. Wood, *Friends Divided: John Adams and Thomas Jefferson* 111 (2017) (explaining that Montesquieu's work, *The Spirit of Laws*, was "the political work most widely read by the revolutionaries."). Montesquieu argued that, in a republican form of government, "the supreme power resides" in "[t]he people" as sovereign. Montesquieu, *The Spirit of Laws* 26 (Thomas Nugent trans., Batoche Books 2001) (1748). Because "the people" hold the supreme power as sovereign, it is "a fundamental maxim . . . that the people should choose" their representatives in a republican government. *Id.* Montesquieu, like Locke, used "the people" to describe the ultimate source of authority in republican civil government.

So two of the most prominent political theorists of the age–whose works inspired the revolutionary generation– used "the people" as a term of art in political theory. When they spoke of "the people," they were referring to the members of a sovereign polity with the power to choose their government. In short, they were referring to the "political community."

This concept of "the people" also appears in perhaps the most famous document in our Nation's history: The Declaration of Independence. There, the Founding generation declared that when a government fails to secure unalienable rights, "it is the Right of *the People* to alter or to

abolish [the government], and to institute new Government, laying its foundation on such principles and organizing its powers in such form, as to them shall seem most likely to effect their Safety and Happiness." Declaration of Independence (1776) (emphasis added). So our Nation's initial founding document uses "the People" to represent the polity entitled to determine self-governance.

The Declaration's language was no accident. Rather, it was the revolutionaries' political philosophy in action. Writing his wife while stationed in Philadelphia during the Continental Congress, John Adams explained that "a Government under the People" was the natural preference in the American Colonies. Letter from John Adams to Abigail Adams, May 17, 1776 (partially reprinted in Wood, *Friends Divided*, at 107). Another delegate to the Congress, Oliver Wolcott, wrote a friend that "[a] Revolution in Government" was in the works in the Colonies, one "founded in Compact" among "the People at large." Letter from Oliver Wolcott to Samuel Lyman, May 16, 1776 (reprinted in 4 *Letters of Delegates to Congress, 1774–1789* 16–17 (Paul H. Smith, et al., eds.) (1979)). And reflecting on the revolutionary era in his retirement, Thomas Jefferson wrote that the "mother principle" of republicanism requires the government to "embody the will of their people, and execute it." Letter from Thomas Jefferson to Samuel Kercheval, July 12, 1816 (partially reprinted in Wood, *Friends Divided*, at 119). Even John Dickinson, who opposed the Declaration, recognized that the "full & free Consent of the People" was a valid basis "to change a Government." John Dickinson's Notes for a Speech in Congress, June 1776 (reprinted in 4 *Letters of Delegates to Congress*, at 166). The upshot of these background principles is that the American Revolution's leading figures believed that "the people" were the supreme

authority in a political system. And when the Founding generation used that term, they meant the sovereign community that consented to a legitimate government. Put another way, when they used "the people," they meant the political community.

### Text and Structure

Connecting these principles, the Constitution's text and structure establish that "the people" in the Second Amendment include only members of the country's political community.

Start with the Preamble. "The Preamble declares that the Constitution is ordained and established by 'the People of the United States.'" *Verdugo-Urquidez*, 494 U.S. at 265. So from the beginning of the Constitution, "We the People" reflects those who "ordained and established" the constitutional compact, which necessarily excludes those outside the nation's political community. After all, "the Constitution of the United States is . . . a compact made by the people of the United States to govern themselves[.]" *Chisholm v. Georgia*, 2 U.S. (2 Dall.) 419, 471 (1793); *see also McCulloch v. Maryland*, 17 U.S. (4 Wheat.) 316, 404–05 (1819) ("The government of the Union . . . is, emphatically and truly, a government of the people. In form, and in substance, it emanates from them. Its powers are granted by them, and are to be exercised directly on them, and for their benefit."). Thus, we must read the Second Amendment with the Preamble's understanding of "the People" in mind. *See* Akhil Reed Amar, *The Bill of Rights: Creation and Reconstruction* 48–49 (1998) ("[T]he 'people' at the core of the Second Amendment were the same 'We the People' who in conventions had 'ordain[ed] and establish[ed]' the Constitution[.]").

The only other time the phrase "the People" appears in the original Constitution, it is associated with those who may participate in our representative democracy. *See* U.S. Const. art. I, § 2, cl. 1 ("The House of Representatives shall be composed of Members chosen every second Year by the People of the several States[.]"). There, "the People" refers to those who select the body politic's representatives. The "Members" of the "House of Representatives" represent "the People of the several States," *id.*, who in turn make up "the People of the United States," *id.* Preamble. So "the People" describes not just any collective group of individual persons, but "the highest authority known to our system" of government: the political community. James Monroe, Views of the President of the United States on the Subject of Internal Improvements (May 4, 1822) (reprinted in 2 James D. Richardson, *A Compilation of the Messages and Papers of the Presidents, 1789–1897* 152–55 (1902)).

One need not look far beyond Article 1, Section 2, to find another provision supporting this reading of "the people." Article I, Section 8 provides that "Congress shall have Power . . . To establish an uniform Rule of Naturalization[.]" U.S. Const. art. I, § 8, cl. 4. Under the Articles of Confederation, each State was free to develop its own rules of naturalization. *See* Articles of Confederation of 1781, art. IV, para. 1. This "dissimilarity in the rules of naturalization," James Madison remarked, was a "fault in our system" that left the Articles vulnerable to "serious embarrassment on [the] subject." The Federalist No. 42, at 265–66 (J. Madison) (Clinton Rossiter ed., 1961). Why? Because different rules for "naturalizing aliens" in each State created different "qualifications" for "the rights of citizenship." *Id.* at 266. By granting Congress the exclusive power to fashion rules of naturalization, the Constitution removes these dissimilarities. *See Chirac v.*

*Chirac's Lessee*, 15 U.S. (2 Wheat.) 259, 269 (1817) (Marshall, C.J.) ("That the power of naturalization is exclusively in congress does not seem to be, and certainly ought not to be, controverted[.])"

The power to naturalize aliens, then, is the power to welcome outsiders into the political community and "confer the rights of citizenship" on them. Federalist No. 42. *See also* 2 James Kent, *Commentaries on American Law* 65–66 (1827) (explaining that a "duly naturalized" alien "becomes entitled to all the privileges and immunities" of citizens). In his famous treatise, Justice Joseph Story described the power of naturalization as the power to "admit[]" aliens "to enjoy all the rights of citizens[.]" 3 Joseph Story, *Commentaries on the Constitution* § 1098 (1833). Outsiders must be welcomed *into something*. The question is what that something is. The most natural answer is that they are admitted into "the people" of the United States. After all, "the People" "ordain[ed] and establish[ed]" the Constitution. U.S. Const. Preamble. And "the people" select their representatives. U.S. Const. art. I, § 2, cl. 1. But the ratifying generation also recognized the advantages of welcoming foreigners into the Union. *See* 5 James Madison, Debates on the Adoption of the Federal Constitution 411–14 (Jonathan Elliot ed.) (1836). So they included a mechanism for the national government to admit foreigners into their ranks.

And the power to admit suggests a corresponding power to exclude. *Cf. Ping v. United States*, 130 U.S. 581, 609 (1889) (explaining that "[t]he power of exclusion of foreigners" is "part of those sovereign powers delegated by the [C]onstitution" to "the government of the United States"). By creating a mechanism for the Union to admit—and exclude—outsiders, the Constitution recognizes that

some individuals are not part of "the people." Through their representatives, the Nation's sovereign political community can choose to admit or exclude others from "the people."

Next, consider the close connection between "the people" in the First and Second Amendments. The First Amendment provides that "Congress shall make no law . . . abridging . . . the right of the people peaceably to assemble, and to petition the Government for a redress of grievances." *See* U.S. Const. amend. I. Like the Second Amendment's "safeguard against tyranny[,]" *Heller*, 554 U.S. at 600, the guarantee of assembly and petition protects the political community's "popular right to alter or abolish the national government," Amar, *The Bill of Rights* at 47; *see also United States ex rel. Turner v. Williams*, 194 U.S. 279, 292 (1904) (questioning whether an illegal alien gains the First Amendment's protections because "[h]e does not become one of the people to whom these things are secured by our Constitution by an attempt to enter forbidden by law"). Thus, the use of "the people" in the First Amendment further cements that the concept of "the people" in the Second Amendment refers to our nation's political community.[1]

---

[1] Of course, the "people" is also used in the Fourth, Ninth, and Tenth Amendments. The Tenth Amendment supports reading the term as referring exclusively to the political community because it uses "the people" in conjunction with the "powers" reserved to them and the States. And while the Ninth Amendment's text does not compel a strong conclusion either way, the Fourth Amendment might be a closer call. That amendment protects the "right of the people" against "unreasonable searches and seizures." *See* U.S. Const. amend. IV. The defendant here, Oscar Vazquez-Ramirez, argues that interpreting the Second Amendment's "the people" to exclude illegal aliens would mean that they are also outside the Fourth Amendment's protection. On one hand, it's sensible to give this term a consistent meaning throughout the Bill of Rights. *See* Antonin Scalia and Bryan A. Garner, Reading Law: The

We also can't forget the Second Amendment's prefatory clause.  It announces *a* purpose of the right—maintenance of "[a] well regulated Militia, being necessary to the security of a free State[.]"  U.S. Const. amend. II.  While the "prefatory clause does not limit or expand the scope of the operative clause," there is an obvious "link" between the two.  *Heller*, 554 U.S. at 577–78.  As *Heller* recognized, the right to keep and bear arms secured a "free State" because it helped repel invasion, suppress insurrections, and resist tyranny.  *See id.* at 597–98.  And the militias were an enterprise for able-bodied citizens.  James Madison called the militia "citizens with arms in their hands."  *Id.* at 595 (quoting Federalist No. 46).  Indeed, shortly after ratification, in 1792, Congress passed the Militia Act, which defined the militia as "each and every free able-bodied white male citizen of the respective states, resident therein," between the ages of 18 and 45.  *Id.* at 596 (quoting Act of May 8, 1792, 1 Stat. 271).

---

Interpretation of Legal Texts 170 (2012) ("[A] word or phrase is presumed to bear the same meaning throughout a text[.]").  Indeed, the Supreme Court has not directly held that aliens unlawfully in the United States are members of the Fourth Amendment's "the people," only "assum[ing without deciding] that illegal aliens in the United States have Fourth Amendment rights."  *See Verdugo-Urquidez*, 494 U.S. at 263 (citing *INS v. Lopez-Mendoza,* 468 U.S. 1032 (1984)).  On the other hand, the Fifth Circuit has ruled that references to "the people" do not necessarily "cover exactly the same groups of people" because "[t]he purposes of the Second and Fourth Amendment[s] are different."  *United States v. Portillo-Munoz*, 643 F.3d 437, 440–41 (5th Cir. 2011).  Given that "[t]he Second Amendment grants an affirmative right . . . while the Fourth Amendment is at its core a protective right," the Fifth Circuit concluded "it [was] reasonable that an affirmative right would be extended to fewer groups than would a protective right."  *Id.* at 441.  In the end, I see no need to resolve this question because the evidence overwhelmingly points to the limited meaning of "the people" in the Second Amendment.

Thus, the prefatory clause's link between a "Militia" and a "free State" reflects the Amendment's "concern with democratic self-government," Amar, *The Bill of Rights* at 47, which only implicates the political community—not all persons within the country.

All in all, text and structure establish that "the people" of the Second Amendment was understood to narrowly encompass only our country's political community. Unlike other constitutional provisions that broadly reference all "person[s]," *see, e.g.*, U.S. Const. amend. V, the Second Amendment guarantee only applies to a smaller subset. As used in the Constitution, "the people" is not the plural form of "person." It is instead a term of art used to describe the sovereign political community. *See Heller*, 554 U.S. at 580.

### Pre-Ratification History

Return to pre-ratification history. Examples abound highlighting that certain groups were considered outside the political community and thus were not part of "the people."[2]

Before the Second Amendment, the preexisting right to keep arms was recognized as "one of the fundamental rights of Englishmen," *Heller*, 554 U.S. at 593–94 (citing 1

---

[2] The per curiam opinion uses many of these same examples as evidence of a historical tradition of firearm regulation disarming aliens under *Bruen*'s second step, which requires analogical reasoning between Founding-era and present-day firearms regulations. While that is reasonable, I take this historical evidence to mean that certain groups were undoubtedly not considered part of the political community in the pre-ratification era and that, when the Founding generation ratified "the people" in the Second Amendment, they would have understood the term not to include these groups. In this way, then, the examples more support *Bruen*'s first-step textual analysis that the Second Amendment's "the people" does not cover illegal aliens.

William Blackstone, *Commentaries on the Laws of England*
*136, *139–40 (1765)). But that preexisting right to keep
arms did not extend to noncitizens, the disloyal, or those
considered "potential subversives" outside the political
community. Joyce Lee Malcolm, *To Keep and Bear Arms:
The Origins of the Anglo-American Right* 140 (1994).[3]

Consider the treatment of Indians. At the Founding,
Indians were considered "peoples outside the polity of the
United States" and so they were not entitled to the Second
Amendment's protection "at the time." Angela R. Riley,
*Indians and Guns*, 100 Geo. L.J. 1675, 1697 (2012). Many
colonies (and later States) banned the sale or trade of
firearms to Indians. *See, e.g.*, Acts Respecting the Indians,

---

[3] While Blackstone observed that "aliens" enjoyed fewer rights than
natural-born English subjects, he included "aliens" in the "denomination
of the people," dividing "the people" into aliens and subjects. *See* 1
William Blackstone, *Commentaries on the Laws of England* *354, *355–
56 (1765). The Eleventh Circuit has taken Blackstone's statement to
suggest that "aliens" may be included within "the people" as that term is
used in the Constitution. *See United States v. Jimenez-Shilon*, 34 F.4th
1042, 1045 (11th Cir. 2022). But this broader meaning of "the people"
doesn't reflect the use of the phrase in a founding document like the
Constitution or in reference to the right to keep and bear arms. The
Eleventh Circuit also relied on James Madison's statement that "'some
aliens' are entitled to the 'protection and advantage' of the Constitution."
*Id.* (quoting 4 Jonathan Elliot, The Debates in the Several State
Conventions on the Adoption of the Federal Constitution 556 (2d ed.
1836)). But Madison doesn't appear to be discussing all constitutional
rights there. Instead, he specifically referenced the jury right and "other
incidents to a fair trial." *Id.* That's consistent with the original
Constitution's guarantee of a jury in trials of "all Crimes," U.S. Const.
Art. III, § 2 cl.3, the Fifth Amendment's guarantee of due process and
grand jury indictments for any "person" rather than "the people," U.S.
Const. amend. V, and the Sixth Amendment's jury-trial guarantee in
"all" criminal prosecutions. U.S. Const. amend. VI.

ch. 58, § 2, *reprinted in The Charters and General Laws of the Colony and Province of Massachusetts Bay* 133 (1814) (enacted 1633); No. 17 Trade for Powder &c Felony, *reprinted in Acts of the General Assembly, Jan. 6, 1639–40*, 4 Wm. & Mary Coll. Q. Hist. Mag. at 150 (July 1924) (enacted by the Virginia colony in 1639); An Act for Preventing Lending Guns, Ammunition, &c. to the Indians, 1723 Conn. Pub. Acts 292; An Act to Regulate the Indian Trade; and for Other Purposes Therein Mentioned, §§ 2–3, *reprinted in* Robert & George Watkins, *A Digest of Laws of the State of Georgia* 288, 288–89 (R. Aitken ed., 1800) (enacted 1784).  And given the close connection between militias and the protection of the nation's political rights, it is no wonder that several States exempted Indians from compulsory militia service.  *See, e.g.*, An Act for Regulating the Militia of the State of New-York, ch. 33, § 1, *reprinted in Laws of the State of New-York, Commencing with the First Session of the Senate and Assembly, After the Declaration of Independency, and the Organization of the New Government of the State, Anno 1777*, at 31 (John Holt ed., 1782) (enacted 1778); An Act for Forming and Regulating the Militia Within This State, and for Repealing All the Laws Heretofore Made for that Purpose, *reprinted in The Laws of the State of New-Hampshire, Together with the Declaration of Independence: The Definitive Treaty of Peace Between the United States of America and His Britannic Majesty; the Constitution of New-Hampshire, and the Constitution of the United States, with Its Proposed Amendments* 357 (John Melcher ed., 1792) (enacted 1786).

Likewise, as then-outsiders to the political community, slaves were denied the right to possess firearms in colonial America.  In 1741, North Carolina passed a law banning slaves from bearing any arm—firearms or otherwise.  An

Act, Concerning Servants and Slaves, ch. 24, §§ 40–42 *reprinted in A Collection of All the Public Acts of Assembly, of the Province of North-Carolina, Now in Force and Use: Together with the Titles of All Such Laws as Are Obsolete, Expir'd, or Repeal'd; and Also, an Exact Table of the Titles of the Acts in Force* 170 (James Davis ed., 1752) (enacted 1741). Several States followed in the years leading to the ratification of the Constitution and beyond. *See, e.g.*, An Act relating to Servants and Slaves, *reprinted in Acts of Assembly, Passed in the Province of Maryland, from 1692, to 1715*, at 147 (John Baskett ed., 1723) (enacted 1715); Slaves, tit. 157, §§ 25–27, *reprinted in* 2 Joseph Brevard, *Alphabetical Digest of the Public Statute Law of South Carolina* 234–35 (1814) (enacted 1740); An Act to amend and continue an Act for the establishing and regulating Patrols, and for preventing any Person from purchasing Provisions or any other Commodities from, or selling such to any Slave, unless such Slave shall produce a Ticket from his or her Owner, Manager, or Employer, §§ 1–2, 1768 Ga. Laws 4, 4–5; An Act to reduce into one the several acts respecting Slaves, Free Negroes, Mulattoes and Indians, ch. 54, § 5, 1798 Ky. Acts 105, 106; A Law for the regulation of Slaves, 1799 Miss. Laws 112, 113; An Act Prescribing the Rules and Conduct to Be Observed with Respect to Negroes and Other Slaves of This Territory, §§ 19–21, *reprinted in* L. Moreau Lislet, 1 *A General Digest of the Acts of the Legislature of Louisiana* 103–04 (1828) (enacted 1806); An Act for preventing Suppressing and punishing the Conspiracy and Insurrection of Negroes and other Slaves, ch. 250, *reprinted in* 1 *The Colonial Laws of New York from the Year 1664 to the Revolution* 766–67 (1894) (enacted 1712).

Reinforcing that the right to keep arms only protected members of the political community, several States disarmed free white men during the Revolutionary War "if they refused a test of allegiance that defined membership in the body politic."  Robert H. Churchill, *Gun Regulation, the Police Power, and the Right to Keep Arms in Early America: The Legal Context of the Second Amendment*, 25 Law & Hist. Rev. 139, 158 (2007).   In 1776, "the Continental Congress recommended that provincial legislatures disarm all persons 'who are notoriously disaffected to the cause of America, or who have not associated, and shall refuse to associate, to defend, by arms, these United Colonies.'"  *Id.* at 159 n.49 (quoting 4 Journals of the Continental Congress, 1774–1789 201–05 (Washington, D.C.: Government Printing Office, 1906)).    Several States followed that recommendation.  *See, e.g.*, An Act for Executing in the Colony of Massachusetts-Bay, in New England, one Resolve of the American Congress, dated March 14, 1776, 1776 Mass. Acts 31, 31–35; An Act, obligating the male white inhabitants of this State to give assurances of allegiance to the same, and for other purposes therein mentioned, ch. 21, §§ 2 & 4, 1777 Pa. Laws 37, 37–39; An Act to Amend an Act Declaring What Crimes and Practices Against the State Shall Be Treason, ch. 6, § 9, 1777 N.C. Sess. Laws 41, 43–44.

Even before revolutionary times, colonial governments restricted militia service or disarmed certain religious minorities out of fears they were not loyal.  A 1756 Virginia law barred Catholics from owning firearms unless they took oaths of allegiance and supremacy to the Commonwealth.  An Act for Disarming Papists, and Reputed Papists, Refusing to Take the Oaths to the Government ch. 4 §§ 1–7, 1756 Va. Acts 35, 35–38.  This disarmament was not on the

basis of faith, but "on the basis of allegiance." Churchill, *Gun Regulation*, 25 Law & Hist. Rev. at 157. Only if "those Catholics [were] willing to swear undivided allegiance to the sovereign," "abjuring the ecclesiastical authority of the Pope" would they earn the right to possess firearms. *Id.* And though Maryland did not outright bar Catholics from possessing firearms, the colony did bar Catholics from enrolling in the colonial militia or possessing firearms in public. 1744 Md. Laws 315, 315–16. This exemption from militia duty was rooted in the colonial government's belief that Catholics "were not completely trusted." Clayton E. Cramer, *Colonial Firearm Regulation*, 16 J. on Firearms & Pub. Pol'y 1, 22 (2004).

And Catholics were not the only minority, religious or otherwise, excluded from enjoying the colonial-era possession of firearms. Acadians, a group of French settlers and ancestors to the Cajuns, "refused to be loyal subjects of the British government" during the French and Indian War. *Id.* at 23. When this group moved from Nova Scotia to Georgia, "the suspicion of disloyalty followed them." *Id.* In response, colonial Georgia barred indentured Acadians from "hav[ing] or us[ing] any fire Arms or other Offensive Weapon otherwise than in his Masters Plantation." An Act providing for & disposing of the Acadians now in this Province, 1757 Ga. Laws 188, 190, *reprinted in* 18 *The Colonial Records of the State of Georgia* 190 (Allen Daniel Candler ed., 1910). This disarmament was based solely on loyalty concerns. Cramer, *Colonial Firearm Regulation*, 16 J. on Firearms & Pub. Pol'y, at 23. These examples are not exhaustive, but show that throughout colonial America, governments denied gun rights to outsiders who posed threats of rebellion against the colonies.

This evidence demonstrates that, in the years before the Constitution's ratification, the American colonies viewed some groups as outside the Nation's sovereign body politic. That the Constitution was ratified against this backdrop suggests that "the people" does not include those outside the political community.

### Post-Ratification History

Next, post-ratification history also shows the limited meaning of "the people." Of course, we must be mindful to "guard against giving postenactment history more weight than it can rightly bear." *Bruen*, 597 U.S. at 35. But courts can, and do, examine sources from the early post-ratification period "to determine the *public understanding* of a legal text[.]" *Heller*, 554 U.S. at 605. Here, early post-ratification sources also confirm that "the people" refers only to the members of the political community.

Leading post-ratification commentators support this view. Justice Joseph Story interpreted "the people" in the Second Amendment as referring only to citizens. He wrote,

> The right of the citizens to keep and bear arms has justly been considered, as the palladium of the liberties of a republic; since it offers a strong moral check against the usurpation and arbitrary power of rulers; and will generally, even if these are successful in the first instance, enable the people to resist and triumph over them.

3 Story, *Commentaries* § 1890. Story thus tied the Second Amendment right to protecting popular sovereignty and thus the right was only necessary for the political community.

William Rawle, another leading post-ratification jurist, interpreted "the people" as the basis for political authority. "In a republic[,]" Rawle explained, "sovereignty resides essentially, and entirely in the people." William Rawle, *A View of the Constitution of the United States of America* 85 (2d ed. 1829). And "citizens" are the ones who "compose the people, and partake of this sovereignty[.]" *Id.* Even if the political community can support more than just citizens, Story and Rawle's views confirm that "the people" is a sovereign political entity, not a meaningless group encompassing all individuals.

And in the 30 years after the Constitution's ratification, several States adopted "Second Amendment analogues" in their state constitutions. *Heller*, 554 U.S. at 602. At least six of them—Alabama, Connecticut, Kentucky, Maine, Mississippi, and Pennsylvania—expressly limited the right to "citizen[s]." *See United States v. Perez*, 6 F.4th 448, 463 n.6 (2d Cir. 2021) (Menashi, J., concurring) (quoting state constitutions). At least another four States—Vermont, Ohio, Indiana, and Missouri—described the right as belonging to "the people." *See Heller*, 554 U.S. at 585 n.8 (quoting state constitutions). But the Supreme Court viewed the terms "the people" and "citizens" synonymously and interpreted these state analogues to "unequivocally protect[] an individual *citizen's* right to self-defense." *Id.* at 603 (emphasis added). Thus, immediately after the Second Amendment's ratification, the right to keep and bear arms was understood to belong only to members of the political community regardless of whether the term "citizen" or "the people" was used.

Although anathema today, free Black Americans were often viewed as outside the American polity in many southern States post-ratification and concomitantly

restricted from the right to bear arms. *See* Paul Finkelman, *Prelude to the Fourteenth Amendment: Black Legal Rights in the Antebellum North*, 17 Rutgers L.J. 415, 419–421 (1986) (describing that while some northern States vested political rights onto Black Americans, this was in great contrast to the political conditions in the antebellum South); 1792 Va. Acts ch. 103, §§ 8–9 (generally banning firearms from free Blacks with few exceptions); Act of Feb. 8, 1798, ch. 54, § 5, 1798 Ky. Acts 105, 106; 1806 Md. Laws ch. 81, §§ 1–2, at 46, 47; *see also* Clayton E. Cramer, *The Racist Roots of Gun Control*, 4 Kan. J. L. & Pub. Pol'y 17, 18–20 (1995) (describing similar laws in New Orleans (1803), Tennessee (1834), and North Carolina (1840)).

These post-ratification sources thus further establish that "the people" did not include those considered outside the political community.

### *Modern Precedent*

Reading the Second Amendment's "the people" to mean only the members of the political community also follows from Supreme Court precedent.

Consider *Heller*. That case stated that "'the people' . . . *unambiguously* refers to all members of the political community." *Heller*, 554 U.S. at 580 (emphasis added). It then repeatedly affirmed that the Second Amendment right belonged to "Americans" or "citizens." *See id.* at 581 ("We start . . . with a strong presumption that the Second Amendment right is exercised individually and belongs to all Americans."); *id.* at 625 ("[T]he Second Amendment does not protect those weapons not typically possessed by law-abiding citizens for lawful purposes[.]"); *id.* at 630 (The District's handgun ban "makes it impossible for citizens to use them for the core lawful purpose of self-defense and is

hence unconstitutional."); *id.* at 635 ("[The Second Amendment] surely elevates above all other interests the right of law-abiding, responsible citizens to use arms in defense of hearth and home."). Thus, *Heller* suggested that citizenship was a touchstone of the Second Amendment right.

True, *Heller* also quoted *Verdugo-Urquidez*, which defined "the people" under the Fourth Amendment more broadly to include the "class of persons who are part of a national community or who have otherwise developed sufficient connection with this country to be considered part of that community." *Id.* at 580 (quoting *Verdugo-Urquidez*, 494 U.S. at 265). But *Heller* also explained that "the people" "unambiguously refers to all members of the political community[.]" *Heller*, 554 U.S. at 580. As Vazquez-Ramirez's own expert opined, this choice was no accident. *See* Pratheepan Gulasekaram, *"The People" of the Second Amendment: Citizenship and the Right to Bear Arms*, 85 N.Y.U. L. Rev. 1521, 1536 (2010) (*Heller*'s shift in language was "intended to constrict the constitutional definition of 'the people.' Reformulating membership with a 'political' rather than a 'national' lens is significant because the former implies only those with political rights—e.g., voting, public office—while the latter is malleable, potentially including all who believe in the ideals of, and are connected to, the nation."); *see also id.* at 1530–31 ("[I]n deliberately trying to situate the right of armed self-defense in the pantheon of constitutional rights," *Heller* "identifies the right-holders at different points as 'all members of the political community,' 'all Americans,' 'citizens,' 'Americans,' and 'law-abiding citizens.'"). We thus can't ignore *Heller*'s gloss on the meaning of "the people,"

especially given its consistency with the phrase's historical understanding.

After *Heller*, the Supreme Court repeatedly assumed that citizenship was a prerequisite for asserting the Second Amendment right. *McDonald* was first, observing that the Second Amendment means that "*citizens* must be permitted 'to use [handguns] for the core lawful purpose of self-defense.'" *McDonald v. City of Chicago, Ill.,* 561 U.S. 742, 767–68 (2010) (plurality opinion) (simplified) (emphasis added) (quoting *Heller*, 554 U.S. at 630). *Bruen* similarly defined the Amendment's scope to protect "ordinary, law-abiding *citizens*." *See* 597 U.S. at 9 (emphasis added), *see also id.* at 11, 15, 26, 29–31, 38, 60, 70–71. So too in *Rahimi*. *United States v. Rahimi*, 602 U.S. 680, 691, 701 (describing the Second Amendment as applying to "ordinary *citizens*" (emphasis added)). Even our court has recognized the scholarly consensus that "the right to bear arms was inextricably tied to the concept of a virtuous citizenry." *United States v. Vongxay*, 594 F.3d 1111, 1118 (9th Cir. 2010) (simplified), *abrogated on other grounds by*, *Bruen*, 597 U.S. at 19.

\* \* \*

Text, history, and precedent all align. At the ratification of the Second Amendment, the right belonged only to "the people," which was understood as the members of the nation's political community. True, at the Founding, that political community was narrowly drawn. We have rightfully broadened the political community's scope. But it still has its limits.

**B.**

Having determined that the Second Amendment right only protects members of our nation's political community, I next consider whether illegal aliens belong in that group. They do not.

Illegal aliens in the United States today are not among "the people" protected by the Second Amendment's text. Illegal aliens lack any allegiance to the United States and are unlawfully present in the country. Definitionally, illegal aliens are not part of the sovereign body politic. Under federal law, an "alien" is "any person not a citizen or national of the United States." 8 U.S.C. § 1101(a)(3). And a "national" is "a person owing permanent allegiance to a state." § 1101(a)(21). So an "alien" is a person who is neither "a citizen of the United States" nor "a person who, though not a citizen of the United States, owes permanent allegiance to the United States." § 1101(a)(22). Federal law thus recognizes the commonsense principle that an illegal alien—a "national" of another state—owes his or her permanent allegiance to another sovereign.

Indeed, the naturalization process requires an alien to take an oath "renounc[ing] and abjur[ing] absolutely and entirely all allegiance and fidelity to any foreign prince, potentate, state, or sovereignty[.]" 8 U.S.C. § 1448(a)(2). In exercising its authority to welcome outsiders into the political community, Congress considers allegiance a key to admission. *See* Federalist No. 42; 2 Kent, *Commentaries* 65. Allegiance is thus a necessary condition for membership in "the people." Because illegal aliens owe their allegiance to a foreign sovereign, they are not part of the political community that the Constitution contemplates.

Lacking any allegiance to our country, illegal aliens cannot exercise many of the political rights of citizens of our country. They cannot vote in federal elections. 18 U.S.C. § 611(a). They cannot hold federal office. U.S. Const. art. I, § 2, cl. 2; *id.* art. I § 3, cl. 3; *id.* art. II, § 1, cl. 5. And they cannot serve on federal juries. 28 U.S.C. § 1865(b)(1).

Unlawful presence—and its consequences—also show that illegal aliens are not part of "the people." Their very presence in the United States violates federal law. 8 U.S.C. § 1325. As the Fourth Circuit observed, "the crime of illegal entry inherently carries this additional aspect that leaves an illegal alien's status substantially unprotected by the Constitution in many respects." *United States v. Carpio-Leon*, 701 F.3d 974, 981 (4th Cir. 2012). And, subject to limited exceptions, the federal government may remove them from the country at any time. *See* 8 U.S.C. § 1227(a). As a result, illegal aliens "are likely to maintain no permanent address in this country." *Portillo-Munoz*, 643 F.3d at 441 (simplified). Indeed, for the most part, illegal aliens can't even be lawfully employed. *See* 8 U.S.C. § 1324a; *see also Sugarman v. Dougall*, 413 U.S. 634, 649 (1973) (observing that "[a] restriction on the employment of noncitizens" could be relevant for "defining 'political community.'").

All this reinforces what common sense suggests: illegal aliens cannot fully participate in our nation politically, socially, or economically. They simply "cannot assert the rights in general obtaining in a land [to which] they do not belong as citizens or otherwise." *Williams*, 194 U.S. at 292. They thus cannot be considered members of the political community entitled to Second Amendment protection.

Because illegal aliens are not covered by the Second Amendment's plain text, Vasquez-Ramirez's as-applied challenge to § 922(g)(5)(A) fails. *See Bruen*, 597 U.S. at 32. And so I agree with the per curiam opinion affirming his conviction.

Of course, this doesn't answer every question. While illegal aliens are not among "the people" protected by the Second Amendment, this doesn't answer whether *legally* present aliens, such as legal permanent residents, may invoke the Second Amendment guarantee. This also doesn't answer how the Second Amendment's incorporation against the States through the Due Process Clause, which applies to "person[s]," changes the analysis for a state law challenge. *See McDonald*, 561 U.S. at 850 n.19 (Thomas, J., concurring). Those are difficult questions on which I express no views. For now, it is enough to make clear that illegal aliens are not among "the people" the Second Amendment protects.